## SHEPPARD *v.* MAXWELL, WARDEN.

No. 490.   Argued February 28, 1966.—Decided June 6, 1966.

334

*F. Lee Bailey* argued the cause for petitioner. With him on the brief were *Russell A. Sherman* and *Benjamin L. Clark*.

*William B. Saxbe,* Attorney General of Ohio, and *John T. Corrigan* argued the cause for respondent. With *Mr. Saxbe* on the brief was *David L. Kessler,* Assistant Attorney General.

*Bernard A. Berkman* argued the cause for the American Civil Liberties Union et al., as *amici curiae,* urging reversal. With him on the brief was *Melvin L. Wulf.*

*John T. Corrigan* and *Gertrude Bauer Mahon* filed a brief for the State of Ohio, as *amicus curiae,* urging affirmance.

MR. JUSTICE CLARK delivered the opinion of the Court.

This federal habeas corpus application involves the question whether Sheppard was deprived of a fair trial in his state conviction for the second-degree murder of his wife because of the trial judge's failure to protect Sheppard sufficiently from the massive, pervasive and prejudicial publicity that attended his prosecution.[1] The United States District Court held that he was not afforded a fair trial and granted the writ subject to the State's right to put Sheppard to trial again, 231 F. Supp. 37 (D. C. S. D. Ohio 1964). The Court of Appeals for the Sixth Circuit reversed by a divided vote, 346 F. 2d 707 (1965). We granted certiorari, 382 U. S. 916 (1965). We have concluded that Sheppard did not receive a fair trial consistent with the Due Process Clause of the Fourteenth Amendment and, therefore, reverse the judgment.

I.

Marilyn Sheppard, petitioner's pregnant wife, was bludgeoned to death in the upstairs bedroom of their lake-

---

[1] Sheppard was convicted in 1954 in the Court of Common Pleas of Cuyahoga County, Ohio. His conviction was affirmed by the Court of Appeals for Cuyahoga County, 100 Ohio App. 345, 128 N. E. 2d 471 (1955), and the Ohio Supreme Court, 165 Ohio St. 293, 135 N. E. 2d 340 (1956). We denied certiorari on the original application for review. 352 U. S. 910 (1956).

shore home in Bay Village, Ohio, a suburb of Cleveland. On the day of the tragedy, July 4, 1954, Sheppard pieced together for several local officials the following story: He and his wife had entertained neighborhood friends, the Aherns, on the previous evening at their home. After dinner they watched television in the living room. Sheppard became drowsy and dozed off to sleep on a couch. Later, Marilyn partially awoke him saying that she was going to bed. The next thing he remembered was hearing his wife cry out in the early morning hours. He hurried upstairs and in the dim light from the hall saw a "form" standing next to his wife's bed. As he struggled with the "form" he was struck on the back of the neck and rendered unconscious. On regaining his senses he found himself on the floor next to his wife's bed. He rose, looked at her, took her pulse and "felt that she was gone." He then went to his son's room and found him unmolested. Hearing a noise he hurried downstairs. He saw a "form" running out the door and pursued it to the lake shore. He grappled with it on the beach and again lost consciousness. Upon his recovery he was lying face down with the lower portion of his body in the water. He returned to his home, checked the pulse on his wife's neck, and "determined or thought that she was gone." [2] He then went downstairs and called a neighbor, Mayor Houk of Bay Village. The Mayor and his wife came over at once, found Sheppard slumped in an easy chair downstairs and asked, "What happened?" Sheppard replied: "I don't know but somebody ought to try to do something for Marilyn." Mrs. Houk immediately went up to the bedroom. The Mayor told Sheppard, "Get hold of yourself. Can you tell me what hap-

---

[2] The several witnesses to whom Sheppard narrated his experiences differ in their description of various details. Sheppard claimed the vagueness of his perception was caused by his sudden awakening, the dimness of the light, and his loss of consciousness.

pened?" Sheppard then related the above-outlined events. After Mrs. Houk discovered the body, the Mayor called the local police, Dr. Richard Sheppard, petitioner's brother, and the Aherns. The local police were the first to arrive. They in turn notified the Coroner and Cleveland police. Richard Sheppard then arrived, determined that Marilyn was dead, examined his brother's injuries, and removed him to the nearby clinic operated by the Sheppard family.[3] When the Coroner, the Cleveland police and other officials arrived, the house and surrounding area were thoroughly searched, the rooms of the house were photographed, and many persons, including the Houks and the Aherns, were interrogated. The Sheppard home and premises were taken into "protective custody" and remained so until after the trial.[4]

From the outset officials focused suspicion on Sheppard. After a search of the house and premises on the morning of the tragedy, Dr. Gerber, the Coroner, is reported—and it is undenied—to have told his men, "Well, it is evident the doctor did this, so let's go get the confession out of him." He proceeded to interrogate and examine Sheppard while the latter was under sedation in his hospital room. On the same occasion, the Coroner was given the clothes Sheppard wore at the time of the tragedy together with the personal items in them. Later that afternoon Chief Eaton and two Cleveland police officers interrogated Sheppard at some length, confronting him with evidence and demanding explanations. Asked by Officer Shotke to take a lie detector test, Sheppard said he would if it were reliable. Shotke replied that it was "infallible" and "you might as well tell us

---

[3] Sheppard was suffering from severe pain in his neck, a swollen eye, and shock.

[4] But newspaper photographers and reporters were permitted access to Sheppard's home from time to time and took pictures throughout the premises.

all about it now." At the end of the interrogation Shotke told Sheppard: "I think you killed your wife." Still later in the same afternoon a physician sent by the Coroner was permitted to make a detailed examination of Sheppard. Until the Coroner's inquest on July 22, at which time he was subpoenaed, Sheppard made himself available for frequent and extended questioning without the presence of an attorney.

On July 7, the day of Marilyn Sheppard's funeral, a newspaper story appeared in which Assistant County Attorney Mahon—later the chief prosecutor of Sheppard—sharply criticized the refusal of the Sheppard family to permit his immediate questioning. From there on headline stories repeatedly stressed Sheppard's lack of cooperation with the police and other officials. Under the headline "Testify Now In Death, Bay Doctor Is Ordered," one story described a visit by Coroner Gerber and four police officers to the hospital on July 8. When Sheppard insisted that his lawyer be present, the Coroner wrote out a subpoena and served it on him. Sheppard then agreed to submit to questioning without counsel and the subpoena was torn up. The officers questioned him for several hours. On July 9, Sheppard, at the request of the Coroner, re-enacted the tragedy at his home before the Coroner, police officers, and a group of newsmen, who apparently were invited by the Coroner. The home was locked so that Sheppard was obliged to wait outside until the Coroner arrived. Sheppard's performance was reported in detail by the news media along with photographs. The newspapers also played up Sheppard's refusal to take a lie detector test and "the protective ring" thrown up by his family. Front-page newspaper headlines announced on the same day that "Doctor Balks At Lie Test; Retells Story." A column opposite that story contained an "exclusive" interview with Sheppard headlined: " 'Loved My Wife, She Loved Me,' Sheppard Tells

News Reporter." The next day, another headline story disclosed that Sheppard had "again late yesterday refused to take a lie detector test" and quoted an Assistant County Attorney as saying that "at the end of a nine-hour questioning of Dr. Sheppard, I felt he was now ruling [a test] out completely." But subsequent newspaper articles reported that the Coroner was still pushing Sheppard for a lie detector test. More stories appeared when Sheppard would not allow authorities to inject him with "truth serum." [5]

On the 20th, the "editorial artillery" opened fire with a front-page charge that somebody is "getting away with murder." The editorial attributed the ineptness of the investigation to "friendships, relationships, hired lawyers, a husband who ought to have been subjected instantly to the same third-degree to which any other person under similar circumstances is subjected . . . ." The following day, July 21, another page-one editorial was headed: "Why No Inquest? Do It Now, Dr. Gerber." The Coroner called an inquest the same day and subpoenaed Sheppard. It was staged the next day in a school gymnasium; the Coroner presided with the County Prosecutor as his advisor and two detectives as bailiffs. In the front of the room was a long table occupied by reporters, television and radio personnel, and broadcasting equipment. The hearing was broadcast with live microphones placed at the Coroner's seat and the witness stand. A swarm of reporters and photographers attended. Sheppard was brought into the room by police who searched him in full view of several hundred spectators. Sheppard's counsel were present during the three-day inquest but were not permitted to participate.

---

[5] At the same time, the newspapers reported that other possible suspects had been "cleared" by lie detector tests. One of these persons was quoted as saying that he could not understand why an innocent man would refuse to take such a test.

When Sheppard's chief counsel attempted to place some documents in the record, he was forcibly ejected from the room by the Coroner, who received cheers, hugs, and kisses from ladies in the audience. Sheppard was questioned for five and one-half hours about his actions on the night of the murder, his married life, and a love affair with Susan Hayes.[6] At the end of the hearing the Coroner announced that he "could" order Sheppard held for the grand jury, but did not do so.

Throughout this period the newspapers emphasized evidence that tended to incriminate Sheppard and pointed out discrepancies in his statements to authorities. At the same time, Sheppard made many public statements to the press and wrote feature articles asserting his innocence.[7] During the inquest on July 26, a headline in large type stated: "Kerr [Captain of the Cleveland Police] Urges Sheppard's Arrest." In the story, Detective McArthur "disclosed that scientific tests at the Sheppard home have definitely established that the killer washed off a trail of blood from the murder bedroom to the downstairs section," a circumstance casting doubt on Sheppard's accounts of the murder. No such evidence was produced at trial. The newspapers also delved into Sheppard's personal life. Articles stressed his extramarital love affairs as a motive for the crime. The newspapers portrayed Sheppard as a Lothario, fully explored his relationship with Susan Hayes, and named a number of other women who were allegedly involved with him. The testimony at trial never showed that

---

[6] The newspapers had heavily emphasized Sheppard's illicit affair with Susan Hayes, and the fact that he had initially lied about it.

[7] A number of articles calculated to evoke sympathy for Sheppard were printed, such as the letters Sheppard wrote to his son while in jail. These stories often appeared together, with news coverage which was unfavorable to him.

Sheppard had any illicit relationships besides the one with Susan Hayes.

On July 28, an editorial entitled "Why Don't Police Quiz Top Suspect" demanded that Sheppard be taken to police headquarters. It described him in the following language:

> "Now proved under oath to be a liar, still free to go about his business, shielded by his family, protected by a smart lawyer who has made monkeys of the police and authorities, carrying a gun part of the time, left free to do whatever he pleases . . . ."

A front-page editorial on July 30 asked: "Why Isn't Sam Sheppard in Jail?" It was later titled "Quit Stalling—Bring Him In." After calling Sheppard "the most unusual murder suspect ever seen around these parts" the article said that "[e]xcept for some superficial questioning during Coroner Sam Gerber's inquest he has been scot-free of any official grilling . . . ." It asserted that he was "surrounded by an iron curtain of protection [and] concealment."

That night at 10 o'clock Sheppard was arrested at his father's home on a charge of murder. He was taken to the Bay Village City Hall where hundreds of people, newscasters, photographers and reporters were awaiting his arrival. He was immediately arraigned—having been denied a temporary delay to secure the presence of counsel—and bound over to the grand jury.

The publicity then grew in intensity until his indictment on August 17. Typical of the coverage during this period is a front-page interview entitled: "DR. SAM: 'I Wish There Was Something I Could Get Off My Chest—but There Isn't.'" Unfavorable publicity included items such as a cartoon of the body of a sphinx with Sheppard's head and the legend below: " 'I Will Do Everything In My Power to Help Solve This Terrible

Murder.' —Dr. Sam Sheppard." Headlines announced, *inter alia*, that: "Doctor Evidence is Ready for Jury," "Corrigan Tactics Stall Quizzing," "Sheppard 'Gay Set' Is Revealed By Houk," "Blood Is Found In Garage," "New Murder Evidence Is Found, Police Claim," "Dr. Sam Faces Quiz At Jail On Marilyn's Fear Of Him." On August 18, an article appeared under the headline "Dr. Sam Writes His Own Story." And reproduced across the entire front page was a portion of the typed statement signed by Sheppard: "I am not guilty of the murder of my wife, Marilyn. How could I, who have been trained to help people and devoted my life to saving life, commit such a terrible and revolting crime?" We do not detail the coverage further. There are five volumes filled with similar clippings from each of the three Cleveland newspapers covering the period from the murder until Sheppard's conviction in December 1954. The record includes no excerpts from newscasts on radio and television but since space was reserved in the courtroom for these media we assume that their coverage was equally large.

## II.

With this background the case came on for trial two weeks before the November general election at which the chief prosecutor was a candidate for common pleas judge and the trial judge, Judge Blythin, was a candidate to succeed himself. Twenty-five days before the case was set, 75 veniremen were called as prospective jurors. All three Cleveland newspapers published the names and addresses of the veniremen. As a consequence, anonymous letters and telephone calls, as well as calls from friends, regarding the impending prosecution were received by all of the prospective jurors. The selection of the jury began on October 18, 1954.

The courtroom in which the trial was held measured 26 by 48 feet. A long temporary table was set up inside

the bar, in back of the single counsel table. It ran the width of the courtroom, parallel to the bar railing, with one end less than three feet from the jury box. Approximately 20 representatives of newspapers and wire services were assigned seats at this table by the court. Behind the bar railing there were four rows of benches. These seats were likewise assigned by the court for the entire trial. The first row was occupied by representatives of television and radio stations, and the second and third rows by reporters from out-of-town newspapers and magazines. One side of the last row, which accommodated 14 people, was assigned to Sheppard's family and the other to Marilyn's. The public was permitted to fill vacancies in this row on special passes only. Representatives of the news media also used all the rooms on the courtroom floor, including the room where cases were ordinarily called and assigned for trial. Private telephone lines and telegraphic equipment were installed in these rooms so that reports from the trial could be speeded to the papers. Station WSRS was permitted to set up broadcasting facilities on the third floor of the courthouse next door to the jury room, where the jury rested during recesses in the trial and deliberated. Newscasts were made from this room throughout the trial, and while the jury reached its verdict.

On the sidewalk and steps in front of the courthouse, television and newsreel cameras were occasionally used to take motion pictures of the participants in the trial, including the jury and the judge. Indeed, one television broadcast carried a staged interview of the judge as he entered the courthouse. In the corridors outside the courtroom there was a host of photographers and television personnel with flash cameras, portable lights and motion picture cameras. This group photographed the prospective jurors during selection of the jury. After the trial opened, the witnesses, counsel, and jurors were

photographed and televised whenever they entered or left the courtroom. Sheppard was brought to the courtroom about 10 minutes before each session began; he was surrounded by reporters and extensively photographed for the newspapers and television. A rule of court prohibited picture-taking in the courtroom during the actual sessions of the court, but no restraints were put on photographers during recesses, which were taken once each morning and afternoon, with a longer period for lunch.

All of these arrangements with the news media and their massive coverage of the trial continued during the entire nine weeks of the trial. The courtroom remained crowded to capacity with representatives of news media. Their movement in and out of the courtroom often caused so much confusion that, despite the loud-speaker system installed in the courtroom, it was difficult for the witnesses and counsel to be heard. Furthermore, the reporters clustered within the bar of the small courtroom made confidential talk among Sheppard and his counsel almost impossible during the proceedings. They frequently had to leave the courtroom to obtain privacy. And many times when counsel wished to raise a point with the judge out of the hearing of the jury it was necessary to move to the judge's chambers. Even then, news media representatives so packed the judge's anteroom that counsel could hardly return from the chambers to the courtroom. The reporters vied with each other to find out what counsel and the judge had discussed, and often these matters later appeared in newspapers accessible to the jury.

The daily record of the proceedings was made available to the newspapers and the testimony of each witness was printed verbatim in the local editions, along with objections of counsel, and rulings by the judge. Pictures of Sheppard, the judge, counsel, pertinent witnesses, and the jury often accompanied the daily news-

paper and television accounts. At times the newspapers published photographs of exhibits introduced at the trial, and the rooms of Sheppard's house were featured along with relevant testimony.

The jurors themselves were constantly exposed to the news media. Every juror, except one, testified at *voir dire* to reading about the case in the Cleveland papers or to having heard broadcasts about it. Seven of the 12 jurors who rendered the verdict had one or more Cleveland papers delivered in their home; the remaining jurors were not interrogated on the point. Nor were there questions as to radios or television sets in the jurors' homes, but we must assume that most of them owned such conveniences. As the selection of the jury progressed, individual pictures of prospective members appeared daily. During the trial, pictures of the jury appeared over 40 times in the Cleveland papers alone. The court permitted photographers to take pictures of the jury in the box, and individual pictures of the members in the jury room. One newspaper ran pictures of the jurors at the Sheppard home when they went there to view the scene of the murder. Another paper featured the home life of an alternate juror. The day before the verdict was rendered—while the jurors were at lunch and sequestered by two bailiffs—the jury was separated into two groups to pose for photographs which appeared in the newspapers.

## III.

We now reach the conduct of the trial. While the intense publicity continued unabated, it is sufficient to relate only the more flagrant episodes:

1. On October 9, 1954, nine days before the case went to trial, an editorial in one of the newspapers criticized defense counsel's random poll of people on the streets as to their opinion of Sheppard's guilt or innocence in an

effort to use the resulting statistics to show the necessity for change of venue. The article said the survey "smacks of mass jury tampering," called on defense counsel to drop it, and stated that the bar association should do something about it. It characterized the poll as "non-judicial, non-legal, and nonsense." The article was called to the attention of the court but no action was taken.

2. On the second day of *voir dire* examination a debate was staged and broadcast live over WHK radio. The participants, newspaper reporters, accused Sheppard's counsel of throwing roadblocks in the way of the prosecution and asserted that Sheppard conceded his guilt by hiring a prominent criminal lawyer. Sheppard's counsel objected to this broadcast and requested a continuance, but the judge denied the motion. When counsel asked the court to give some protection from such events, the judge replied that "WHK doesn't have much coverage," and that "[a]fter all, we are not trying this case by radio or in newspapers or any other means. We confine ourselves seriously to it in this courtroom and do the very best we can."

3. While the jury was being selected, a two-inch headline asked: "But Who Will Speak for Marilyn?" The front-page story spoke of the "perfect face" of the accused. "Study that face as long as you want. Never will you get from it a hint of what might be the answer . . . ." The two brothers of the accused were described as "Prosperous, poised. His two sisters-in law. Smart, chic, well-groomed. His elderly father. Courtly, reserved. A perfect type for the patriarch of a staunch clan." The author then noted Marilyn Sheppard was "still off stage," and that she was an only child whose mother died when she was very young and whose father had no interest in the case. But the author—through quotes from Detective Chief James McArthur—assured readers that the prosecution's exhibits would speak for

Marilyn. "Her story," McArthur stated, "will come into this courtroom through our witnesses." The article ends:

> "Then you realize how what and who is missing from the perfect setting will be supplied.
> "How in the Big Case justice will be done.
> "Justice to Sam Sheppard.
> "And to Marilyn Sheppard."

4. As has been mentioned, the jury viewed the scene of the murder on the first day of the trial. Hundreds of reporters, cameramen and onlookers were there, and one representative of the news media was permitted to accompany the jury while it inspected the Sheppard home. The time of the jury's visit was revealed so far in advance that one of the newspapers was able to rent a helicopter and fly over the house taking pictures of the jurors on their tour.

5. On November 19, a Cleveland police officer gave testimony that tended to contradict details in the written statement Sheppard made to the Cleveland police. Two days later, in a broadcast heard over Station WHK in Cleveland, Robert Considine likened Sheppard to a perjurer and compared the episode to Alger Hiss' confrontation with Whittaker Chambers. Though defense counsel asked the judge to question the jury to ascertain how many heard the broadcast, the court refused to do so. The judge also overruled the motion for continuance based on the same ground, saying:

> "Well, I don't know, we can't stop people, in any event, listening to it. It is a matter of free speech, and the court can't control everybody. . . . We are not going to harass the jury every morning. . . . It is getting to the point where if we do it every morning, we are suspecting the jury. I have confidence in this jury . . . ."

6. On November 24, a story appeared under an eight-column headline: "Sam Called A 'Jekyll-Hyde' By Marilyn, Cousin To Testify." It related that Marilyn had recently told friends that Sheppard was a "Dr. Jekyll and Mr. Hyde" character. No such testimony was ever produced at the trial. The story went on to announce: "The prosecution has a 'bombshell witness' on tap who will testify to Dr. Sam's display of fiery temper—countering the defense claim that the defendant is a gentle physician with an even disposition." Defense counsel made motions for change of venue, continuance and mistrial, but they were denied. No action was taken by the court.

7. When the trial was in its seventh week, Walter Winchell broadcast over WXEL television and WJW radio that Carole Beasley, who was under arrest in New York City for robbery, had stated that, as Sheppard's mistress, she had borne him a child. The defense asked that the jury be queried on the broadcast. Two jurors admitted in open court that they had heard it. The judge asked each: "Would that have any effect upon your judgment?" Both replied, "No." This was accepted by the judge as sufficient; he merely asked the jury to "pay no attention whatever to that type of scavenging. . . . Let's confine ourselves to this courtroom, if you please." In answer to the motion for mistrial, the judge said:

> "Well, even, so, Mr. Corrigan, how are you ever going to prevent those things, in any event? I don't justify them at all. I think it is outrageous, but in a sense, it is outrageous even if there were no trial here. The trial has nothing to do with it in the Court's mind, as far as its outrage is concerned, but—

"Mr. Corrigan: I don't know what effect it had on the mind of any of these jurors, and I can't find out unless inquiry is made.

"The Court: How would you ever, in any jury, avoid that kind of a thing?"

8. On December 9, while Sheppard was on the witness stand he testified that he had been mistreated by Cleveland detectives after his arrest. Although he was not at the trial, Captain Kerr of the Homicide Bureau issued a press statement denying Sheppard's allegations which appeared under the headline: " 'Bare-faced Liar,' Kerr Says of Sam." Captain Kerr never appeared as a witness at the trial.

9. After the case was submitted to the jury, it was sequestered for its deliberations, which took five days and four nights. After the verdict, defense counsel ascertained that the jurors had been allowed to make telephone calls to their homes every day while they were sequestered at the hotel. Although the telephones had been removed from the jurors' rooms, the jurors were permitted to use the phones in the bailiffs' rooms. The calls were placed by the jurors themselves; no record was kept of the jurors who made calls, the telephone numbers or the parties called. The bailiffs sat in the room where they could hear only the jurors' end of the conversation. The court had not instructed the bailiffs to prevent such calls. By a subsequent motion, defense counsel urged that this ground alone warranted a new trial, but the motion was overruled and no evidence was taken on the question.

## IV.

The principle that justice cannot survive behind walls of silence has long been reflected in the "Anglo-American distrust for secret trials." *In re Oliver*, 333 U. S. 257,

268 (1948). A responsible press has always been re-garded as the handmaiden of effective judicial administra-tion, especially in the criminal field. Its function in this regard is documented by an impressive record of service over several centuries. The press does not simply pub-lish information about trials but guards against the mis-carriage of justice by subjecting the police, prosecutors, and judicial processes to extensive public scrutiny and criticism. This Court has, therefore, been unwilling to place any direct limitations on the freedom traditionally exercised by the news media for "[w]hat transpires in the court room is public property." *Craig* v. *Harney,* 331 U. S. 367, 374 (1947). The "unqualified prohibitions laid down by the framers were intended to give to lib-erty of the press . . . the broadest scope that could be countenanced in an orderly society." *Bridges* v. *Cali-fornia,* 314 U. S. 252, 265 (1941). And where there was "no threat or menace to the integrity of the trial," *Craig* v. *Harney, supra,* at 377, we have consistently required that the press have a free hand, even though we sometimes deplored its sensationalism.

But the Court has also pointed out that "[l]egal trials are not like elections, to be won through the use of the meeting-hall, the radio, and the newspaper." *Bridges* v. *California, supra,* at 271. And the Court has insisted that no one be punished for a crime without "a charge fairly made and fairly tried in a public tribunal free of prejudice, passion, excitement, and tyrannical power." *Chambers* v. *Florida,* 309 U. S. 227, 236–237 (1940). "Freedom of discussion should be given the widest range compatible with the essential requirement of the fair and orderly administration of justice." *Pennekamp* v. *Florida,* 328 U. S. 331, 347 (1946). But it must not be allowed to divert the trial from the "very purpose of a court system . . . to adjudicate controversies, both crim-inal and civil, in the calmness and solemnity of the

courtroom according to legal procedures." *Cox* v. *Louisiana,* 379 U. S. 559, 583 (1965) (BLACK, J., dissenting). Among these "legal procedures" is the requirement that the jury's verdict be based on evidence received in open court, not from outside sources. Thus, in *Marshall* v. *United States,* 360 U. S. 310 (1959), we set aside a federal conviction where the jurors were exposed "through news accounts" to information that was not admitted at trial. We held that the prejudice from such material "may indeed be greater" than when it is part of the prosecution's evidence "for it is then not tempered by protective procedures." At 313. At the same time, we did not consider dispositive the statement of each juror "that he would not be influenced by the news articles, that he could decide the case only on the evidence of record, and that he felt no prejudice against petitioner as a result of the articles." At 312. Likewise, in *Irvin* v. *Dowd,* 366 U. S. 717 (1961), even though each juror indicated that he could render an impartial verdict despite exposure to prejudicial newspaper articles, we set aside the conviction holding:

> "With his life at stake, it is not requiring too much that petitioner be tried in an atmosphere undisturbed by so huge a wave of public passion . . . ." At 728.

The undeviating rule of this Court was expressed by Mr. Justice Holmes over half a century ago in *Patterson* v. *Colorado,* 205 U. S. 454, 462 (1907):

> "The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print."

Moreover, "the burden of showing essential unfairness . . . as a demonstrable reality," *Adams* v. *United*

*States ex rel. McCann,* 317 U. S. 269, 281 (1942), need not be undertaken when television has exposed the community "repeatedly and in depth to the spectacle of [the accused] personally confessing in detail to the crimes with which he was later to be charged." *Rideau* v. *Louisiana,* 373 U. S. 723, 726 (1963). In *Turner* v. *Louisiana,* 379 U. S. 466 (1965), two key witnesses were deputy sheriffs who doubled as jury shepherds during the trial. The deputies swore that they had not talked to the jurors about the case, but the Court nonetheless held that,

> "even if it could be assumed that the deputies never did discuss the case directly with any members of the jury, it would be blinking reality not to recognize the extreme prejudice inherent in this continual association . . . ." At 473.

Only last Term in *Estes* v. *Texas,* 381 U. S. 532 (1965), we set aside a conviction despite the absence of any showing of prejudice. We said there:

> "It is true that in most cases involving claims of due process deprivations we require a showing of identifiable prejudice to the accused. Nevertheless, at times a procedure employed by the State involves such a probability that prejudice will result that it is deemed inherently lacking in due process." At 542–543.

And we cited with approval the language of MR. JUSTICE BLACK for the Court in *In re Murchison,* 349 U. S. 133, 136 (1955), that "our system of law has always endeavored to prevent even the probability of unfairness."

## V.

It is clear that the totality of circumstances in this case also warrants such an approach. Unlike Estes, Sheppard was not granted a change of venue to a locale away from

where the publicity originated; nor was his jury seques-
tered.  The Estes jury saw none of the television broad-
casts from the courtroom.  On the contrary, the Sheppard
jurors were subjected to newspaper, radio and television
coverage of the trial while not taking part in the proceed-
ings.  They were allowed to go their separate ways out-
side of the courtroom, without adequate directions not to
read or listen to anything concerning the case.  The
judge's "admonitions" at the beginning of the trial are
representative:

> "I would suggest to you and caution you that you
> do not read any newspapers during the progress of
> this trial, that you do not listen to radio comments
> nor watch or listen to television comments, insofar
> as this case is concerned.  You will feel very much
> better as the trial proceeds . . . .  I am sure that
> we shall all feel very much better if we do not in-
> dulge in any newspaper reading or listening to any
> comments whatever about the matter while the case
> is in progress.  After it is all over, you can read it
> all to your heart's content . . . ."

At intervals during the trial, the judge simply repeated
his "suggestions" and "requests" that the jurors not ex-
pose themselves to comment upon the case.  Moreover,
the jurors were thrust into the role of celebrities by the
judge's failure to insulate them from reporters and pho-
tographers.  See *Estes* v. *Texas, supra,* at 545–546.  The
numerous pictures of the jurors, with their addresses,
which appeared in the newspapers before and during the
trial itself exposed them to expressions of opinion from
both cranks and friends.  The fact that anonymous let-
ters had been received by prospective jurors should have
made the judge aware that this publicity seriously threat-
ened the jurors' privacy.

The press coverage of the Estes trial was not nearly
as massive and pervasive as the attention given by the

Cleveland newspapers and broadcasting stations to Sheppard's prosecution.[8] Sheppard stood indicted for the murder of his wife; the State was demanding the death penalty. For months the virulent publicity about Sheppard and the murder had made the case notorious. Charges and countercharges were aired in the news media besides those for which Sheppard was called to trial. In addition, only three months before trial, Sheppard was examined for more than five hours without counsel during a three-day inquest which ended in a public brawl. The inquest was televised live from a high school gymnasium seating hundreds of people. Furthermore, the trial began two weeks before a hotly contested election at which both Chief Prosecutor Mahon and Judge Blythin were candidates for judgeships.[9]

While we cannot say that Sheppard was denied due process by the judge's refusal to take precautions against the influence of pretrial publicity alone, the court's later rulings must be considered against the setting in which

---

[8] Many more reporters and photographers attended the Sheppard trial. And it attracted several nationally famous commentators as well.

[9] At the commencement of trial, defense counsel made motions for continuance and change of venue. The judge postponed ruling on these motions until he determined whether an impartial jury could be impaneled. *Voir dire* examination showed that with one exception all members selected for jury service had read something about the case in the newspapers. Since, however, all of the jurors stated that they would not be influenced by what they had read or seen, the judge overruled both of the motions. Without regard to whether the judge's actions in this respect reach dimensions that would justify issuance of the habeas writ, it should be noted that a short continuance would have alleviated any problem with regard to the judicial elections. The court in *Delaney* v. *United States,* 199 F. 2d 107, 115 (C. A. 1st Cir. 1952), recognized such a duty under similar circumstances, holding that "if assurance of a fair trial would necessitate that the trial of the case be postponed until after the election, then we think the law required no less than that."

the trial was held. In light of this background, we believe that the arrangements made by the judge with the news media caused Sheppard to be deprived of that "judicial serenity and calm to which [he] was entitled." *Estes* v. *Texas, supra,* at 536. The fact is that bedlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom, hounding most of the participants in the trial, especially Sheppard. At a temporary table within a few feet of the jury box and counsel table sat some 20 reporters staring at Sheppard and taking notes. The erection of a press table for reporters inside the bar is unprecedented. The bar of the court is reserved for counsel, providing them a safe place in which to keep papers and exhibits, and to confer privately with client and co-counsel. It is designed to protect the witness and the jury from any distractions, intrusions or influences, and to permit bench discussions of the judge's rulings away from the hearing of the public and the jury. Having assigned almost all of the available seats in the courtroom to the news media the judge lost his ability to supervise that environment. The movement of the reporters in and out of the courtroom caused frequent confusion and disruption of the trial. And the record reveals constant commotion within the bar. Moreover, the judge gave the throng of newsmen gathered in the corridors of the courthouse absolute free rein. Participants in the trial, including the jury, were forced to run a gantlet of reporters and photographers each time they entered or left the courtroom. The total lack of consideration for the privacy of the jury was demonstrated by the assignment to a broadcasting station of space next to the jury room on the floor above the courtroom, as well as the fact that jurors were allowed to make telephone calls during their five-day deliberation.

## VI.

There can be no question about the nature of the publicity which surrounded Sheppard's trial. We agree, as did the Court of Appeals, with the findings in Judge Bell's opinion for the Ohio Supreme Court:

> "Murder and mystery, society, sex and suspense were combined in this case in such a manner as to intrigue and captivate the public fancy to a degree perhaps unparalleled in recent annals. Throughout the preindictment investigation, the subsequent legal skirmishes and the nine-week trial, circulation-conscious editors catered to the insatiable interest of the American public in the bizarre. . . . In this atmosphere of a 'Roman holiday' for the news media, Sam Sheppard stood trial for his life." 165 Ohio St., at 294, 135 N. E. 2d, at 342.

Indeed, every court that has considered this case, save the court that tried it, has deplored the manner in which the news media inflamed and prejudiced the public.[10]

Much of the material printed or broadcast during the trial was never heard from the witness stand, such as the charges that Sheppard had purposely impeded the murder investigation and must be guilty since he had

---

[10] Typical comments on the trial by the press itself include:

"The question of Dr. Sheppard's guilt or innocence still is before the courts. Those who have examined the trial record carefully are divided as to the propriety of the verdict. But almost everyone who watched the performance of the Cleveland press agrees that a fair hearing for the defendant, in that area, would be a modern miracle." Harrison, "The Press vs. the Courts," The Saturday Review (Oct. 15, 1955).

"At this distance, some 100 miles from Cleveland, it looks to us as though the Sheppard murder case was sensationalized to the point at which the press must ask itself if its freedom, carried to excess, doesn't interfere with the conduct of fair trials." Editorial, The Toledo Blade (Dec. 22, 1954).

hired a prominent criminal lawyer; that Sheppard was a perjurer; that he had sexual relations with numerous women; that his slain wife had characterized him as a "Jekyll-Hyde"; that he was "a bare-faced liar" because of his testimony as to police treatment; and, finally, that a woman convict claimed Sheppard to be the father of her illegitimate child. As the trial progressed, the newspapers summarized and interpreted the evidence, devoting particular attention to the material that incriminated Sheppard, and often drew unwarranted inferences from testimony. At one point, a front-page picture of Mrs. Sheppard's blood-stained pillow was published after being "doctored" to show more clearly an alleged imprint of a surgical instrument.

Nor is there doubt that this deluge of publicity reached at least some of the jury. On the only occasion that the jury was queried, two jurors admitted in open court to hearing the highly inflammatory charge that a prison inmate claimed Sheppard as the father of her illegitimate child. Despite the extent and nature of the publicity to which the jury was exposed during trial, the judge refused defense counsel's other requests that the jurors be asked whether they had read or heard specific prejudicial comment about the case, including the incidents we have previously summarized. In these circumstances, we can assume that some of this material reached members of the jury. See *Commonwealth* v. *Crehan*, 345 Mass. 609, 188 N. E. 2d 923 (1963).

## VII.

The court's fundamental error is compounded by the holding that it lacked power to control the publicity about the trial. From the very inception of the proceedings the judge announced that neither he nor anyone else could restrict prejudicial news accounts. And he

reiterated this view on numerous occasions. Since he viewed the news media as his target, the judge never considered other means that are often utilized to reduce the appearance of prejudicial material and to protect the jury from outside influence. We conclude that these procedures would have been sufficient to guarantee Sheppard a fair trial and so do not consider what sanctions might be available against a recalcitrant press nor the charges of bias now made against the state trial judge.[11]

The carnival atmosphere at trial could easily have been avoided since the courtroom and courthouse premises are subject to the control of the court. As we stressed in *Estes*, the presence of the press at judicial proceedings must be limited when it is apparent that the accused might otherwise be prejudiced or disadvantaged.[12] Bearing in mind the massive pretrial publicity, the judge should have adopted stricter rules governing the use of the courtroom by newsmen, as Sheppard's counsel requested. The number of reporters in the courtroom itself could have been limited at the first sign that their presence would disrupt the trial. They certainly should not have been placed inside the bar. Furthermore, the judge should have more closely regulated the conduct of newsmen in the courtroom. For instance, the judge belatedly asked them not to handle and photograph trial exhibits lying on the counsel table during recesses.

---

[11] In an unsworn statement, which the parties agreed would have the status of a deposition, made 10 years after Sheppard's conviction and six years after Judge Blythin's death, Dorothy Kilgallen asserted that Judge Blythin had told her: "It's an open and shut case . . . he is guilty as hell." It is thus urged that Sheppard be released on the ground that the judge's bias infected the entire trial. But we need not reach this argument, since the judge's failure to insulate the proceedings from prejudicial publicity and disruptive influences deprived Sheppard of the chance to receive a fair hearing.

[12] The judge's awareness of his power in this respect is manifest from his assignment of seats to the press.

Secondly, the court should have insulated the witnesses. All of the newspapers and radio stations apparently interviewed prospective witnesses at will, and in many instances disclosed their testimony. A typical example was the publication of numerous statements by Susan Hayes, before her appearance in court, regarding her love affair with Sheppard. Although the witnesses were barred from the courtroom during the trial the full verbatim testimony was available to them in the press. This completely nullified the judge's imposition of the rule. See *Estes* v. *Texas, supra,* at 547.

Thirdly, the court should have made some effort to control the release of leads, information, and gossip to the press by police officers, witnesses, and the counsel for both sides. Much of the information thus disclosed was inaccurate, leading to groundless rumors and confusion.[13] That the judge was aware of his responsibility in this respect may be seen from his warning to Steve Sheppard, the accused's brother, who had apparently made public statements in an attempt to discredit testimony for the prosecution. The judge made this statement in the presence of the jury:

> "Now, the Court wants to say a word. That he was told—he has not read anything about it at all— but he was informed that Dr. Steve Sheppard, who

---

[13] The problem here was further complicated by the independent action of the newspapers in reporting "evidence" and gossip which they uncovered. The press not only inferred that Sheppard was guilty because he "stalled" the investigation, hid behind his family, and hired a prominent criminal lawyer, but denounced as "mass jury tampering" his efforts to gather evidence of community prejudice caused by such publications. Sheppard's counterattacks added some fuel but, in these circumstances, cannot preclude him from asserting his right to a fair trial. Putting to one side news stories attributed to police officials, prospective witnesses, the Sheppards, and the lawyers, it is possible that the other publicity "would itself have had a prejudicial effect." Cf. Report of the President's Commission on the Assassination of President Kennedy, at 239.

has been granted the privilege of remaining in the
court room during the trial, has been trying the case
in the newspapers and making rather uncompli-
mentary comments about the testimony of the wit-
nesses for the State.

"Let it be now understood that if Dr. Steve Shep-
pard wishes to use the newspapers to try his case
while we are trying it here, he will be barred from
remaining in the court room during the progress of
the trial if he is to be a witness in the case.

"The Court appreciates he cannot deny Steve
Sheppard the right of free speech, but he can deny
him the . . . privilege of being in the court room,
if he wants to avail himself of that method during
the progress of the trial."

Defense counsel immediately brought to the court's atten-
tion the tremendous amount of publicity in the Cleveland
press that "misrepresented entirely the testimony" in the
case.   Under such circumstances, the judge should have
at least warned the newspapers to check the accuracy
of their accounts.   And it is obvious that the judge
should have further sought to alleviate this problem by
imposing control over the statements made to the news
media by counsel, witnesses, and especially the Coroner
and police officers.   The prosecution repeatedly made
evidence available to the news media which was never
offered in the trial.   Much of the "evidence" dissemi-
nated in this fashion was clearly inadmissible.   The ex-
clusion of such evidence in court is rendered meaningless
when news media make it available to the public.   For
example, the publicity about Sheppard's refusal to take
a lie detector test came directly from police officers and
the Coroner.[14]   The story that Sheppard had been called

---

[14] When two police officers testified at trial that Sheppard refused
to take a lie detector test, the judge declined to give a requested
instruction that the results of such a test would be inadmissible

a "Jekyll-Hyde" personality by his wife was attributed to a prosecution witness. No such testimony was given. The further report that there was "a 'bombshell witness' on tap" who would testify as to Sheppard's "fiery temper" could only have emanated from the prosecution. Moreover, the newspapers described in detail clues that had been found by the police, but not put into the record.[15]

The fact that many of the prejudicial news items can be traced to the prosecution, as well as the defense, aggravates the judge's failure to take any action. See *Stroble v. California,* 343 U. S. 181, 201 (1952) (Frankfurter, J., dissenting). Effective control of these sources—concededly within the court's power—might well have prevented the divulgence of inaccurate information, rumors, and accusations that made up much of the inflammatory publicity, at least after Sheppard's indictment.

More specifically, the trial court might well have proscribed extrajudicial statements by any lawyer, party, witness, or court official which divulged prejudicial matters, such as the refusal of Sheppard to submit to interrogation or take any lie detector tests; any statement made by Sheppard to officials; the identity of prospective witnesses or their probable testimony; any belief in guilt or innocence; or like statements concerning the merits of the case. See *State v. Van Duyne,* 43 N. J. 369, 389, 204 A. 2d 841, 852 (1964), in which the court interpreted Canon 20 of the American Bar Association's Canons of Professional Ethics to prohibit such statements.

---

in any event. He simply told the jury that no person has an obligation "to take any lie detector test."

[15] Such "premature disclosure and weighing of the evidence" may seriously jeopardize a defendant's right to an impartial jury. "[N]either the press nor the public had a right to be contemporaneously informed by the police or prosecuting authorities of the details of the evidence being accumulated against [Sheppard]." Cf. Report of the President's Commission, *supra,* at 239, 240.

Being advised of the great public interest in the case, the mass coverage of the press, and the potential prejudicial impact of publicity, the court could also have requested the appropriate city and county officials to promulgate a regulation with respect to dissemination of information about the case by their employees.[16] In addition, reporters who wrote or broadcast prejudicial stories, could have been warned as to the impropriety of publishing material not introduced in the proceedings. The judge was put on notice of such events by defense counsel's complaint about the WHK broadcast on the second day of trial. See p. 346, *supra*. In this manner, Sheppard's right to a trial free from outside interference would have been given added protection without corresponding curtailment of the news media. Had the judge, the other officers of the court, and the police placed the interest of justice first, the news media would have soon learned to be content with the task of reporting the case as it unfolded in the courtroom—not pieced together from extrajudicial statements.

From the cases coming here we note that unfair and prejudicial news comment on pending trials has become increasingly prevalent. Due process requires that the accused receive a trial by an impartial jury free from outside influences. Given the pervasiveness of modern communications and the difficulty of effacing prejudicial publicity from the minds of the jurors, the trial courts must take strong measures to ensure that the balance is never weighed against the accused. And appellate tribunals have the duty to make an independent evaluation of the circumstances. Of course, there is nothing

---

[16] The Department of Justice, the City of New York, and other governmental agencies have issued such regulations. *E. g.*, 28 CFR § 50.2 (1966). For general information on this topic see periodic publications (*e. g.*, Nos. 71, 124, and 158) by the Freedom of Information Center, School of Journalism, University of Missouri.

that proscribes the press from reporting events that transpire in the courtroom. But where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity. In addition, sequestration of the jury was something the judge should have raised *sua sponte* with counsel. If publicity during the proceedings threatens the fairness of the trial, a new trial should be ordered. But we must remember that reversals are but palliatives; the cure lies in those remedial measures that will prevent the prejudice at its inception. The courts must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences. Neither prosecutors, counsel for defense, the accused, witnesses, court staff nor enforcement officers coming under the jurisdiction of the court should be permitted to frustrate its function. Collaboration between counsel and the press as to information affecting the fairness of a criminal trial is not only subject to regulation, but is highly censurable and worthy of disciplinary measures.

Since the state trial judge did not fulfill his duty to protect Sheppard from the inherently prejudicial publicity which saturated the community and to control disruptive influences in the courtroom, we must reverse the denial of the habeas petition. The case is remanded to the District Court with instructions to issue the writ and order that Sheppard be released from custody unless the State puts him to its charges again within a reasonable time.

*It is so ordered.*

Mr. Justice Black dissents.