**UNITED STATES of America, Plaintiff,**

v.

**Kenny BINGHAM, et al., Defendants.**

**No. 89 CR 909.**

United States District Court, N.D. Illinois, E.D.

Aug. 13, 1991.

---

## MEMORANDUM OPINION

HOLDERMAN, District Judge:

This multi-defendant criminal case is one of a series of criminal cases filed in this federal district court in the past few years [1] as a result of a multi-jurisdictional investigation into alleged crimes by persons alleged to have been associated with the Chicago street gang the El Rukns.[2] The indictment in this case alleges, among other criminal violations, RICO conspiracy, narcotics conspiracy, and numerous racketeering acts which include allegations of multiple murders, kidnapping, witness intimidation, obstruction of justice and narcotics distribution.

On August 9, 1991 the jury concluded its deliberations as to the thirteen alleged El Rukn members on trial. That trial began April 9, 1991. The trials of certain other defendants named in the indictment were severed and are scheduled to begin later this year. The charges against one person named as a defendant in the indictment have been dropped. Other defendants have pleaded guilty and still others remain fugitives.

This opinion deals not with the defendants nor with the indictment's allegations but instead with a collateral matter: the conduct of two of the defense counsel, Charles J. Aron and Deborah J. Gubin, on the eve of the jury selection in the now concluded trial. The court believes that conduct was improper and contemptuous. Consequently the court recommends the Executive Committee of this United States District Court examine the matter and decide whether to impose disciplinary sanctions pursuant to the appropriate procedures, *see* Local General Rule 3.50, *et seq.*, and the United States Attorney of the Northern District for Illinois investigate and decide whether to file criminal contempt charges under 18 U.S.C. Section 401(3) against Mr. Aron and Ms. Gubin, attorneys of record in this case. *See, e.g., United States v. Kozel,* 908 F.2d 205 (7th Cir.1990).

## I. DISCUSSION OF THE FACTS

For many years Local Criminal Rule 1.07 ("Rule 1.07") of this United States District Court has set forth the duties of counsel relating to extrajudicial statements about pending criminal cases. Rule 1.07 states in pertinent part that:

---

**1.** *See, e.g., United States v. Jeff Fort, et al.,* 86 CR 572 (N.D.Ill.) (Norgle, J.), *aff'd, United States v. McAnderson,* 914 F.2d 934 (7th Cir.1990); *United States v. Victor Johnson, et al.,* 88 CR 555 (N.D.Ill.) (Leinenweber, J.), *aff'd,* 903 F.2d 1084 (7th Cir.1990); *United States v. Henry Andrews, et al.,* 754 F.Supp. 1161 (N.D.Ill.1990) (severance order), *revised at* 754 F.Supp. 1197 (N.D.Ill. 1990) (Two separate trials are presently proceeding before District Judges Aspen and Conlon).

**2.** The Seventh Circuit in *United States v. McAnderson,* 914 F.2d 934, 939 (7th Cir.1990) described the El Rukns as follows:

The El Rukns are a Chicago street gang with slightly over 100 members. The gang began in the 1960's as the Blackstone Rangers. In the 1970's, they were known as the Black P Stone Nation. In the 1980's, Jeff Fort became the undisputed leader of the gang and the organization was renamed the El Rukns, meaning "cornerstone." The El Rukns, under Fort, became a carefully structured enterprise. Fort, the "Imam", sat at the top of the hierarchy. Beneath him in descending rank were "generals," "Officer Muftis," "ambassadors," and "soldiers" or "Els." Under Fort's leadership, the El Rukns also embraced the Muslim faith. Their headquarters at 3947 South Drexel was known as the "Mosque," and occasional religious services, educational classes and social gatherings were held there.

**Rule 1.07. Public Discussion by Attorneys of Pending or Imminent Criminal Litigation**

**a. Duty of Attorneys Not to Release Or Authorize Release of Information.** It is the duty of the United States Attorney or a lawyer not to release or authorize the release of information or opinion which a reasonable person would expect to be disseminated by means of public communications, in connection with pending or imminent criminal litigation with which he/she or the firm is associated, if such dissemination poses a serious and imminent threat of interference with the fair administration of justice.

\*    \*    \*    \*    \*    \*

**d.** During the trial of any criminal matter including the period of selection of the jury, no United States Attorney or lawyer or law firm associated with the prosecution or defense shall give or authorize any extrajudicial statement or interview, relating to the trial or the parties or issues in the trial which a reasonable person would expect to be disseminated by means of public communication, except that the United States Attorney, or lawyer or law firm may quote from or refer without comment to public records of the court in the case.[3]

Additionally, at the March 4, 1991 status report in this case, with Mr. Aron and Ms. Gubin present, the court stated, among other things:

I don't anticipate that any of you experienced lawyers will make any comments to the media ... but I want all counsel to be aware that comments to the media should be kept to a minimum and avoided unless there is some pressing need to talk to the media.[4]

(March 4, 1991, Tr. 25.)

On March 29, 1991 the court granted the "Government's Motion for Anonymous Jury" without detailing fully its reasoning so as to minimize possible prejudice resulting from media commentary regarding that issue so close to the scheduled trial date.

On April 9, 1991, the first day of trial, the court met with counsel and the parties. The court's explanation of procedures to counsel and the court's ruling on newly filed motions consumed the day so the commencement of jury selection was deferred to the next day. Among other matters discussed on April 9, the court explained the procedure which would be followed the next morning in selecting the anonymous jury (April 9, 1991, Tr. 13–21). The court's explanation included a general description of what the venire would be told as to why the jury was anonymous (April 9, 1991, Tr. 16–17).

Also on April 9, 1991, the court addressed a defense motion for change of venue which had as its premise the prejudicial nature of the pretrial publicity surrounding the case. The court in denying that motion stated, "We'll just wait and see [tomorrow] whether this panel of jurors has been so exposed to news media and the articles listed in that motion that they won't be able to be fair and impartial" (April 9, 1991, Tr. 78–79).

When counsel left the courtroom for the day on April 9, 1991, the court certainly did not expect any of them to personally contribute to the case's media exposure that evening. There is no question that Ms. Gubin and Mr. Aron, by submitting themselves to be interviewed on television and making the statements they made for broadcast to the Chicagoland area, the same area from which the venire would be coming the·following morning, created a "serious and imminent threat of interference with the fair administration of justice." (Rule 1.07.)

**3.** In 1975 the Seventh Circuit upheld the constitutionality of subsection 1.07(d), "if the appropriate serious and imminent standard were to be incorporated," *Chicago Council of Lawyers v. Bauer,* 522 F.2d 242, 255 (7th Cir.1975), which, the Seventh Circuit noted, the district court had ruled was incorporated into all paragraphs of Rule 1.07 by the general statement in Rule 1.07(a). *Id.* at 251 n. 7.

**4.** At no time did Mr. Aron or Ms. Gubin express that their subsequent television interviews resulted from "some pressing need to talk to the media."

Exhibit "Videotape No. 1" contains the segments of Ms. Gubin's and Mr. Aron's videotaped interviews which were aired on news broadcasts on ABC's Chicago television station, WLS, Channel 7, and on CNN–Cable News Network that same evening, April 9, 1991.

The court has excluded for purposes of its recommendations the statements which Mr. Keith Bromery (the Channel 7 reporter who conducted the videotaped interviews) attributed to Ms. Gubin and Mr. Aron on Videotape No. 1 that:

> Defense attorneys contend that their clients cannot receive a fair trial because all fourteen defendants are lumped together essentially under one large case ... [and]

> Defense attorneys also say they are upset over Judge James Holderman's decision to empanel a so-called anonymous jury to hear the case.

(Videotape No. 1, WLS Channel 7 News, April 9, 1991 broadcast). Considering only the statements made directly by Mr. Aron and Ms. Gubin on the broadcasts actually aired, Mr. Aron's and Ms. Gubin's conduct was contemptuous. Comparing their actual videotaped statements with the recitation each gave in court the next day, their contemptuous conduct appears to be knowing and willful.

When the court inquired on the afternoon of April 10, 1991, less than 24 hours after Ms. Gubin and Mr. Aron made their televised statements, as to "Who spoke to the media?", Ms. Gubin responded:

> MS. GUBIN: Your Honor, I was interviewed. They asked me about the concept of having so many attorneys being present on the case. They then started to ask me about the case, and I said, "There's a pretrial order concerning that," and that was the end. They were asking about what was it like to have so many defense lawyers and defendants at one trial. That was what the questions were concerning, when I was asked.

(April 10, 1991, 4:25 p.m., Tr. 3, lines 2–9.) The court was willing to accept Ms. Gubin's description of her media interview at that point. However, as subsequent events revealed, Ms. Gubin's response to the court's inquiry on April 10, 1991, was woefully lacking in material facts. As was later revealed, at the time of her interview which was both given and televised on the eve of jury selection, Ms. Gubin made inflammatory and denigrating remarks about the government's motive for seeking the selection of the anonymous jury.

> MS. GUBIN: And we're horrified. We found that it is some way that the government is trying to scare the jury, and, like, be afraid of these individuals, that they are so scary that you can't even tell us your name.

(Videotape No. 1, CNN News, April 9, 1991 broadcast.)

Mr. Aron, on the afternoon of April 10, 1991, in response to the court's question, "Who spoke to the media?", offered some remarks after Ms. Gubin admitted she had been interviewed, stating:

> MR. ARON: —as was I. I was standing with Ms. Gubin at the same time. We did not answer any questions about the case, and, as we were led to understand, you said once the trial started we were not to speak to the press, and the trial hadn't started.

(April 10, 1991, 4:25 p.m., Tr. 3, lines 10–14.)

Mr. Aron's statement, "We did not answer any questions about the case," was blatantly false. What Mr. Aron said at his April 9th videotaped television interview about the case and the anonymous jury to be selected the next morning, was:

> MR. ARON: It tends to set an oppressive tone for the trial. The allegations are such of violence and intimidation, and when you have an anonymous jury, it reinforces, before they hear the first scrap of evidence that there could be intimidation.

(Videotape No. 1, WLS, Channel 7 News, April 9, 1991 broadcast.)

On May 7, 1991, after the videotape of the Aron–Gubin television interviews ("Videotape No. 1") had been subpoenaed and reviewed by Ms. Gubin and the court, neither Ms. Gubin nor Mr. Aron offered any

justification for their conduct. Ms. Gubin, for the first time, however, admitted:

> MS. GUBIN: Mr. Aron was asked a question about the anonymous jury. I was then asked another question about the anonymous jury because I had written a response to the government's request for it, and that's what apparently appears on CNN.

(May 7, 1991, Tr. 2812, lines 12–16.) Ms. Gubin proceeded to tell the court on May 7 that, when the television interviewers had asked her about the response she had written to the government's request for an anonymous jury, she gave them her personal opinion, knowing both "CNN and Channel 7 were taping at the same time" (May 7, 1991, Tr. 2812, lines 10–11), that she was "horrified" and "that the government was trying to scare the jury" (May 7, 1991, Tr. 2812, lines 10–11 and 16–22).

Ms. Gubin admitted in court that neither the "horrified" nor the "scare the jury" phraseology was in the written response to the government's motion (May 7, 1991, Tr. 2812–13). Ms. Gubin, in response to the court's questions, admitted the commentary she gave at her televised interview "is not the type of position you take in the voir dire of the jury" (May 7, 1991, Tr. 2813, lines 19–21), and that it would "actually cause some adverse inferences perhaps to be drawn by the venire" (May 7, 1991, Tr. 2813, lines 22–25). When asked by the court why she did what she did, Ms. Gubin stated:

> MS. GUBIN: It was not my intention, your Honor, to do—to prejudice the venire. It was probably poor judgment. I apologize for it. I don't have a better explanation.

Someone other than this court will have to evaluate Ms. Gubin's credibility, based on whatever "better explanation," if any, she may subsequently develop for her conduct. It is clear to this court that she demonstrated her awareness of her guilt when first questioned by the court, by making in-court statements which omitted substantial material facts.

When this court asked Mr. Aron on May 7, 1991, why he did it, he offered, "No excuse" (May 7, 1991, Tr. 2819, line 23). When the court again inquired as to his motivation, Mr. Aron responded: "It was not to influence prospective jurors, that's for sure" (May 7, 1991, Tr. 2820, lines 9–11). In reply to the court's further inquiry, Mr. Aron admitted, "It was a stupid thing to be in front of a television camera" (May 7, 1991, Tr. 2820, lines 12–14). When Mr. Aron finally answered the court's question, "Why did you do it?", Mr. Aron stated: "I can only think ego gratification, your Honor" (May 7, 1991, Tr. 2821, lines 6–8).

Mr. Aron and Ms. Gubin were given a full opportunity to review Videotape No. 1, and an opportunity to make any further statement in defense of their conduct. They offered nothing (May 8, 1991, Tr. 3055, line 5 through 3056, line 3).

A lawyer in a case denigrating an opponent's motives or criticizing a judge's decision regarding jury selection in videotaped public statements on the eve of that jury selection may make a television newscast about an upcoming trial more exciting for the media and the public, but such statements pose a serious and imminent threat of interference with the fair administration of justice. That is why for many years Local Criminal Rule 1.07 has been a part of the law with which lawyers practicing in this federal district have had to abide. Attorney Aron, admitted to practice in Illinois and before this court in 1972, and Attorney Gubin, admitted to practice in Illinois and before this court in 1975, have the same duty imposed by Rule 1.07 as all other lawyers. The record in this case shows they knowingly and wilfully violated that duty. The Executive Committee and the United States Attorney, in detached reflection after examining the facts, should decide what should be done.

## II. DISCUSSION OF THE LAW

Federal Rule of Criminal Procedure 42 addresses criminal contempts. Since the conduct constituting the criminal contempts of Ms. Gubin and Mr. Aron was not committed entirely in the presence of the court, Rule 42(b) applies and should be followed in prosecuting any criminal con-

**1044**

tempt charge against Ms. Gubin and Mr. Aron stemming from the conduct addressed in this opinion. It is this court's view the proper application of the law would subject them each to a maximum penalty of six months in prison and a maximum fine of $5,000, *see In re Betts*, 927 F.2d 983, 986 (7th Cir.1991); *United States v. Kozel*, 908 F.2d 205, 206–07 (7th Cir. 1990).

The Seventh Circuit has stated:

A federal court has the power and discretion to punish contempt of its authority, including acts of disobedience or resistance to its orders or commands. 18 U.S.C. § 401(3). To support a federal contempt conviction, "the government must prove: (1) that the court entered a lawful order of reasonable specificity; (2) the order was violated; and (3) the violation was willful." *United States v. Burstyn*, 878 F.2d 1322, 1324 (11th Cir. 1989) (citations omitted); *see also United States v. Kozel*, 908 F.2d 205, 208 (7th Cir.1990) (Sanctions for criminal contempt depend on proof of a willful violation of a lawful, definite, and specific court order.). Whether an order is reasonably specific "is a question of fact to be resolved with reference to the context in which the order is entered and the audience to which it is addressed." *Burstyn*, 878 F.2d at 1324.

*Betts*, 927 F.2d at 986.[5]

Local Criminal Rule 1.07 was a part of this United States District Court's effort to comport with the United States Supreme Court's mandate that the courts of this country "take such steps by rule and regulation that will protect their processes from prejudicial outside interferences." *Sheppard v. Maxwell*, 384 U.S. 333, 363, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600 (1966). Rule 1.07 was drawn substantially from the Kaufman Report adopted by the Judicial Conference of the United States. *Chicago Council of Lawyers v. Bauer*, 522 F.2d 242, 252 (7th Cir.1975). Although the con-

troversy as to lawyers' extrajudicial statements reached a zenith in the late 1960's and early 1970's, the debate over the proper limits to be imposed on lawyers making extrajudicial statements as to pending cases still exists now in the 1990's. *See, e.g., Gentile v. State Bar of Nevada,* —— U.S. ——, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991).

Because the Supreme Court recently addressed the issue in the *Gentile* case, several pertinent points are clear:

First, *"Collaboration between counsel and the press as to information affecting the fairness of a criminal trial is not only subject to regulation, but is highly censurable and worthy of disciplinary measures." Gentile, supra* [—— U.S. at ——, 111 S.Ct. at 2740], (Rehnquist, C.J., for the Court) (quoting *Sheppard v. Maxwell*, 384 U.S. at 363 [86 S.Ct. at 1522] (emphasis in original)).

Second, "Because lawyers have special access to information through discovery and client communications, their extrajudicial statements pose a threat to the fairness of a pending proceeding since lawyers' statements are likely to be received as especially authoritative." *Gentile, supra* [—— U.S. at ——, 111 S.Ct. at 2745], (Rehnquist, C.J., for the Court).

Third, "The limitations [consistent with the Constitution] are aimed at two principal evils: (1) comments that are likely to influence the actual outcome of the trial, and (2) comments that are likely to prejudice the jury venire, even if an untainted panel can ultimately be found. Few, if any, interests under the Constitution are more fundamental...." *Gentile, supra* [—— U.S. at ——, 111 S.Ct. at 2745], (Rehnquist, C.J. for the Court).

In a separate part of the *Gentile* opinion, Justice Kennedy speaking on behalf of himself, Justice Marshall, Justice Blackmun and Justice Stevens, used as an example of "speech that creates a danger of imminent and substantial harm":

---

5. *See also Chambers v. Nasco, Inc.,* —— U.S. ——, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (the inherent power of a federal court to sanction); *Hi*

*v. Feiock*, 485 U.S. 624, 108 S.Ct. 1423, 99 L.Ed.2d 721 (1988) (the distinctions between civil contempt and criminal contempt).

[A]n attorney of record ... releasing information of grave prejudice on the eve of jury selection....

*Gentile, supra,* —— U.S. at ——, 111 S.Ct. at 2725 (Kennedy, J.)

Justice Kennedy, later in his opinion in *Gentile,* stated:

A statement which reaches the attention of the venire on the eve of *voir dire* might require a continuance or cause difficulties in securing an impartial jury, and at the very least could complicate the jury selection process. *See* ABA Annotated Model Rules of Professional Conduct 243 (1984) (timing of statement a significant factor in determining seriousness and imminence of threat).

*Gentile, supra,* —— U.S. at ——, 111 S.Ct. at 2729 (Kennedy, J.)

There is no doubt in this court's mind that in this case the media coverage, which included the televised April 9th interviews of Ms. Gubin and Mr. Aron, on the eve of the jury selection, posed "a serious and imminent threat of interference with the fair administration of justice" (Rule 1.07) and resulted in several prospective jurors being excused after admitting they could not be fair because of what they had seen or heard about the case in the media. As the court noted on May 7, some prospective jurors even referred to televised news broadcasts the night before jury selection (May 7, 1991, Tr. 2817).

The fact that a fair and impartial jury, which has now returned its verdict, was ultimately selected should not mitigate counsels' contemptuous conduct. The lawyers and other persons who have matters in this district court must be able to look to and rely upon enforcement by this district court of its local rules to aid the fair administration of justice. To look the other way when violations occur would subvert that endeavor.

## RECOMMENDATION

Based upon the foregoing and the record set forth in this case as to the conduct of defense counsel of record, Deborah J. Gubin and Charles J. Aron, in giving a televised interview on the eve of jury selection and wilfully making extrajudicial statements which a reasonable person would expect to be disseminated by means of public communication and which posed a serious and imminent threat of interference with the fair administration of justice, the court recommends that:

(1) the Executive Committee of this United States District Court examine the matter and decide, pursuant to the appropriate procedures, whether to impose disciplinary sanctions against Attorney Charles J. Aron and Attorney Deborah J. Gubin; and

2) the United States Attorney for the Northern District of Illinois investigate the matter and decide whether to prosecute criminal contempt charges against Mr. Aron and Ms. Gubin.