ABELL, et al. *v.* SECRETARY OF STATE
[No. 225 (Adv.), September Term, 1968.]

*Decided per curiam October 9, 1968.*

*Opinion filed November 8, 1968.*

320

The cause was argued before HAMMOND, C. J., and BARNES, McWILLIAMS, SINGLEY and SMITH, JJ.

*Neal P. Myerberg* and *Oliver R. Guyther* for appellants.

*Lewis A. Noonberg, Assistant Attorney General,* with whom was *Francis B. Burch, Attorney General,* on the brief, for appellee.

BARNES, J., delivered the opinion of the Court.

The principal question in this appeal is whether or not Chapter 617 of the Laws of 1963, or a part of that Act, providing for the gradual and eventual total abolition of slot machines by July 1, 1968, could lawfully be referred to a vote of the electorate of Maryland at the general election to be held on November 5, 1968, under Article XVI of the Maryland Constitution upon petitions filed on May 31 and June 26, 1968.

Chapter 617, which was introduced into the General Assembly of Maryland as House Bill 475, has the following title:

"AN ACT to add new Section 264B to Article 27 of the Annotated Code of Maryland (1957 Edition and 1962 Supplement), title 'Crimes and Punishments,' subtitle 'Gaming,' to follow immediately after Section 264A thereof, and to be under the new subheading 'Slot Machines,' defining the term 'Slot Machines,' and providing that it shall be unlawful to locate, possess, keep, maintain or operate such machines within this State, providing certain exceptions as to those counties and municipalities wherein such machines were licensed prior to the effective date of this Act, and providing, as to such counties and municipal-

ities, a limitation upon the maximum number of such machines that may be located, possessed, kept, maintained or operated in any place of business, or in any building, or upon any premises and further providing for the gradual and eventual total abolition by July 1, 1968, of all slot machines within this State, making non-compliance with the provisions of this Act a misdemeanor, and relating generally to slot machines and to their location, possession, keeping, maintenance or operation within this State."

Section 1 contains the usual enacting clause and sets forth the new Section 264B under the new subheading "SLOT MA-CHINES." The first paragraph of the new Section gives the definition of a slot machine. Then follow three subdivisions with Roman Numerals I, II, and III. Subdivision I provides that it shall be unlawful to possess, maintain or operate any slot machine in Maryland except as provided in subdivision II. Subdivision II contains three further subdivisions (A), (B) and (C). II (A) contains four additional subdivisions (1), (2), (3) and (4). We will set out II (A) and (B) in full:

"II. In those counties and municipalities of this State wherein the County Commissioners or municipal authorities thereof, prior to the effective date of this Act, licensed such slot machines for operation therein.

"(A) After July 1, 1965, it shall be unlawful for any person, firm or corporation to conduct any place of business wherein is located or kept, other than in a building or upon any premises used solely for storage, a number of slot machines in excess of the maximum numbers hereinafter set forth, and it shall be unlawful for any person, firm or corporation to possess, keep or maintain, other than in a building or upon any premises used solely for storage, or operate within any one building, or upon any premises, as hereinafter defined, a number of slot machines in excess of the following maximum numbers of such machines:

"(1) At any time after the effective date of this

Act, a number equal to the number located, kept, possessed, maintained or operated in such place of business, building or premises as of March 1, 1963.

"(2) At any time after July 1, 1965, a number equal to the number located, kept, possessed, maintained or operated in such place of business, building or premises as of January 1, 1963, or thirty (30) machines, whichever shall be the lesser number.

"(3) At any time after July 1, 1966, a number equal to the number located, kept, possessed, maintained or operated in such place of business, building or premises as of January 1, 1963, or twenty (20) machines, whichever shall be the lesser number.

"(4) At any time after July 1, 1967, a number equal to the number located, kept, possessed, maintained or operated in such place of business, building or premises as of January 1, 1963, or ten (10) machines, whichever shall be the lesser number.

"(B) After July 1, 1968, it shall be unlawful for any person, firm or corporation, whether as owner, lessor, lessee, licensor, licensee, or otherwise, to possess, kept, maintain or operate, or have in or upon any place of business, building or premises for any purpose any slot machines whatsoever."

II (C) defines "premises." III provides that violation shall be a misdemeanor, with punishment by a specified fine or imprisonment or both.

Section 2 of Chapter 617 provides that the provisions of the Act are not intended to apply to pinball machines if they do not permit any compensation or reward beyond an automatic replay of a game or games mechanically provided upon the machine.

Section 3 sets forth the usual severability clause. Section 4 repeals all inconsistent laws and Section 5 provides that the Act "shall take effect on July 1, 1963." The Act was approved by the Governor on April 30, 1963.

As originally introduced as House Bill 475, Chapter 617 provided for total abolition by July 1, 1966, instead of July 1, 1968.

II (A) originally had the date July 1, 1963 instead of July 1, 1965. In the first line of II (A) (2) the date was July 1, 1963 instead of July 1, 1965; in the first line of II (A) (3) the date was July 1, 1964 instead of July 1, 1966; in the first line of II (A) (4) the date was July 1, 1965 instead of July 1, 1967; and, in II (B) the date was July 1, 1966 instead of July 1, 1968. The extended times were inserted in the original bill by amendment so that the gradual and eventual abolition of slot machines was extended by amendment for an additional two years. There was an appropriate amendment to the title of the Act to indicate that the gradual and eventual total abolition was by July 1, 1968, rather than by July 1, 1966, as originally set forth in the title.

Section 2 in regard to pinball machines was also inserted by amendment and the following sections renumbered.

Section 2 of Article XVI of the Maryland Constitution providing for the referendum provides in relevant part:

"*Section 2. When laws to take effect; effect of filing of referendum petition.*

"No law enacted by the General Assembly shall take effect until the *first day of June next after the session at which it may be passed,* unless it contain a Section declaring such law an emergency law and necessary for the immediate preservation of the public health or safety, and passed upon a yea and nay vote supported by three-fifths of all the members elected to each of the two Houses of the General Assembly; provided, however, that said period of suspension may be extended as provided in Section 3 (b) hereof. If before *said first day of June there shall have been filed with the Secretary of the State a petition to refer* to a vote of the people *any law or part of a law capable of referendum,* as in this Article provided, the same shall be referred by the Secretary of State to such vote, and shall not become a law or take effect until thirty days after its approval by a majority of the electors voting thereon at the next ensuing election held throughout the State for Members of the House of Representatives of

the United States. An emergency law shall remain in force notwithstanding such petition, but shall stand repealed thirty days after having been rejected by a majority of the qualified electors voting thereon; * * *." (Emphasis supplied.)

Section 3 of Article XVI provides as follows:

*"Section 3. Number of signers necessary for petition; effect of petition signed by more than one half required number.*

"(a) The referendum petition against an Act or part of an Act passed by the General Assembly, shall be sufficient if signed by three per centum of the qualified voters of the State of Maryland, calculated upon the whole number of votes cast therein for Governor at the last preceding Gubernatorial election, of whom not more than half shall be residents of Baltimore City, or of any one County; provided that any Public Local Law for any one County or the City of Baltimore, shall be referred by the Secretary of State only to the people of said County or City of Baltimore, upon a referendum petition of ten per cent of the qualified voters of said County or City of Baltimore, as the case may be, calculated upon the whole number of votes cast therein respectively for Governor at the last preceding Gubernatorial election.

"(b) If more than one-half, but less than the full number of signatures required to complete any referendum petition against any law passed by the General Assembly, be filed with Secretary of State before the first day of June, the time for the law to take effect, and for filing the remainder of signatures to complete the petition shall be extended to the thirtieth day of the same month, with like effect."

On May 31, 1968, petitions in proper form were filed with the Secretary of State containing signatures in excess of a figure representing one and one-half per cent of the required qualified voters not more than one-half of whom were residents of

Baltimore City or of any one County, to refer the entire Chapter 617 to the electorate at the next general election, i.e., in November, 1968. On June 26, 1968, the remaining number of required signatures were filed with the Secretary of State. On the same dates petitions with the required number of signatures were filed to refer designated portions of Chapter 617 (including the final phase-out provision). Each of the petitions contained a sufficient number of apparently valid signatures to suspend the operation of a referable law. The Secretary of State refused to refer the Act or any portion of it, on the ground that the petitions were filed some five years too late, and notified J. Franklin Abell, one of the appellants, as president of the Maryland Local Option Association (the Association which had filed the petitions) by a letter of June 26, 1968, of his decision.

Mr. Abell and four others, as taxpayers, voters and two as officers of Maryland Local Option Association filed a petition for the issuance of a writ of mandamus and for other relief in the Circuit Court for Anne Arundel County on June 26, 1968, against the Secretary of State alleging the relevant facts and praying that the writ of mandamus issue commanding the Secretary of State (1) to certify the petitions to refer the entire Act, (2) to refer a part of the Act, and (3) to issue an interlocutory order commanding the Secretary of State to refer both the entire Act and a part of it at the next election in the event the Circuit Court "shall find it necessary to take the matter raised by this Petition sub curia for a period of time subsequent to July 1, 1968, the effective date of the said Chapter 617 of the Acts of 1963."

The Secretary of State filed a demurrer on the morning of June 27, 1968, on the ground that the petitions were filed five years too late and also alleged that the petition for the writ of mandamus should be dismissed. A hearing on the demurrer was held before Judge Paul T. Pitcher. After having heard the arguments of counsel for the respective parties, Judge Pitcher stated:

"Alright, I have heard enough, Gentlemen, on this. For the purposes of the preliminary argument on

whether or not we want to stay the effect of this thing on July 1st, Mr. Noonberg, [Assistant Attorney General representing the Secretary of State] I am going to overrule your demurrer. However, that doesn't foreclose the whole matter. But I want to get on with the argument on the merits of the matter."

Judge Pitcher then heard further argument. At the conclusion of argument, Mr. Noonberg stated:

"If Your Honor please, I would like to procedurally mention that if Your Honor prefers we would at this time, we could move for summary judgment in favor of the Secretary of State on the merits, or we could, we rely on our demurrer which raises the issue also on the merits, which ever Your Honor prefers. I know that the time gun here is a pressure that the petitioners are suggesting, and we would submit which ever way Your Honor wants us to handle it. If Your Honor finds that the petition should be dismissed, the court could do so either on a demurrer or on a motion for a summary judgment which we would be happy to file.

"The Court: Mr. Noonberg, anybody that tried to make a decision in a case with the import of this one in an hour on the morning of June 27th, or any other particular time, unless he was an authority on every one of these cases that have been cited here, and I don't know of any Judge in Maryland that is, would be doing less than justice. As far as the actual merits of this matter are concerned I wouldn't think about making a decision this morning."

Then after the propriety of a stay was discussed and argued, Judge Pitcher made no decision in this regard.

The docket entry was as follows:

"1968 June 27 — Hearing on Petition for a Writ of Mandamus held in Open Court before Judge Pitcher. Demurrer filed. Memorandum of Points and Authorities in Support of Respondents Demurrer filed. Coun-

sel heard. Court overrules Demurrer. Court holds in abeyance."

The docket entries also show that on June 27, 1968, the letter to Mr. Abell from the Secretary of State was filed and on July 31, 1968, two letters were filed, one from the Secretary of State dated July 15, 1968, to Mr. Abell in regard to the signatures on the June 26 and July 1 additional petitions, the other from counsel for the petitioners forwarding the letter of July 15 to Judge Pitcher.

Judge Pitcher unfortunately died suddenly on August 9, 1968, while holding the case sub curia. The matter was then considered by Judge Evans who filed his opinion on September 5, 1968. In his opinion, Judge Evans stated:

"After hearing, Judge Pitcher indicated that he would overrule the demurrer, *but did not make a final ruling.* Judge Pitcher passed away on 9 August 1968, holding the case sub curia.

"No answer was filed or evidence taken in this case and, as the demurrer goes to the merits of the action, *counsel agreed that, after listening to their arguments made before Judge Pitcher and reading the proceedings and briefs filed, I should make a final ruling on the demurrer.*" (Emphasis supplied.)

Judge Evans concluded that the petitions were filed too late and passed an order sustaining the demurrer without leave to amend. From this order the appeal was timely taken by the petitioners to this Court. In view of the importance of the case we expedited the hearing and after hearing argument and considering the briefs of the parties we concluded that the order of the Circuit Court should be affirmed, and passed a per curiam order on October 9, 1968 indicating our affirmance of the order, and requiring the appellants to pay the costs. We now state the reasons for our decision.

The appellants presented three arguments to us:

(1) Chapter 617, in its entirety or in part, may lawfully be referred to referendum upon the filing of the requisite number of qualified signatures of voters before June 1 of the year in

which the Act or part of it becomes operative and effective, i.e., on July 1, 1968.

(2) Judge Evans erred in sustaining the demurrer to the petition when Judge Pitcher had previously overruled the demurrer.

(3) Because of an editorial in the Baltimore News-American of June 28, 1968, and an editorial in the Baltimore Evening Sun of July 8, 1968, an atmosphere was created in which the petitioners could not have a fair and impartial trial, thus denying them due process of law as required by Article 23 of the Declaration of Rights of the Maryland Constitution and by the Fourteenth Amendment to the Constitution of the United States.

We will consider the three arguments in the order named and we will later state such additional facts as are necessary for the consideration of the third argument.

(1)

The argument of the appellants is based on the theory that although Chapter 617 was passed by the General Assembly at the 1963 Session and was approved by the Governor on April 30, 1963, the Act or at least that part of the Act which provides for the final phase-out of slot machines on July 1, 1968, did not become fully implemented, operational or effective until that latter date so that the first half of the petitions could be filed as late as May 31, 1968. The difficulty with this theory is that it is contrary to the express provisions of Section 2 of Article XVI of the Maryland Constitution. As already indicated Section 2 provides that no law *"shall take effect until the first day of June next after the session at which it is passed"* unless it is declared to be an emergency law. Section 2 then continues *"If before said first day of June* there shall have been filed with the Secretary of State a petition to refer to the vote of the people any law or part of a law capable of referendum" the law shall not become a law or take effect until approved by a majority of the voters, but an emergency law shall remain in force and only stand repealed when rejected by a majority of the voters. This language is in mandatory form and it is clear from the language of Section 2 that the petition *must*

be filed before the first day of June next after the session at which the law was passed. The words *"said* first day of June" refer to the previously mentioned "first day of June next after the session at which it is passed" and this language definitely establishes when the referendum petition must be filed to be effective.

Our predecessors, in *Winebrenner v. Salmon,* 155 Md. 563, 565, 142 A. 723, 724 (1928), a case involving the referability under Article XVI of an act making an appropriation to maintain the State government, have indicated (but not held) that our construction of Section 2 of Article XVI is correct. In that case, Judge Adkins, for the Court, stated:

> "By Article 16 of the Constitution of Maryland, known as 'The Referendum,' the people reserved to themselves power by petition to have submitted to the registered voters of the state, to approve or reject at the polls, any act or part of any act of the General Assembly, if approved by the Governor, or, if passed by the General Assembly over the veto of the Governor. The method of accomplishing this is by a petition signed by the designated number of vote[r]s, or percentage (depending upon whether the act to be submitted is a general or a local law), *the petition to be filed before the first day of June following the passage of the act."* (Emphasis supplied.) (155 Md. at 565, 142 A. at 724.)

The United States District Court for the District of Maryland reached the same conclusion in a per curiam opinion filed on June 28, 1968, in the case of *Mills v. Agnew,* 286 F. Supp. 107. This case was heard by Thomsen, C. J. and Watkins, D. J. That Court stated:

> "Plaintiffs' final charge is that '[t]he Attorney General and Secretary of State have refused to allow the bill to referendum in violation of the constitution of the State of Maryland and the due process and equal protection clauses of the 14th Amendment to the Constitution of the United States.' This argument raises

no substantial question under the United States Con-
sitution. As was clearly pointed out by the Attorney
General of Maryland in his opinion dated June 19,
1968, Section 2 of Article XVI of the Maryland Con-
stitution requires that a petition for a referendum must
be filed before the first day of June next after the ses-
sion at which the act in question was passed, regard-
less of the date the Act is to go into effect and regard-
less of any date or dates contained within the Act pro-
viding for a phase-out or other staggered period. See
also *Winebrenner v. Salmon*, 155 Md. 563, 565, 142
A. 723 (1928). The Act in question was passed
in 1963, and the petition for referendum was not filed
until 1968." (286 F. Supp. at 110.)

The Attorney General has brought to our attention that
Judges Bowen and Powers recently reached the same conclu-
sion in the Circuit Court for St. Mary's County in the cases
of *Abell, Inc., et al v. Burroughs, et al*, Equity No. A-3147;
*Wester, et al v. Lyons, et al*, Equity No. 2575 and *Downes, et
al v. Garner, et al*, Equity No. 2058A (all consolidated). No
appeal was taken from the orders implementing the court's de-
cision in those cases.

The appellants earnestly argue that Article XVI permits the
reference of a part of an act (which it does) and in view of
the fact that the General Assembly separated into separate sub-
paragraphs of subdivision II of Section 264B the times when
portions of the Act should become operative, these respective
subparagraphs, including subparagraph (B) phasing out all slot
machines after July 1, 1968, should be considered parts of the
Act "effective" at the times mentioned and hence such portions
should be subject to referendum if valid referendum petitions
are filed prior to the respective dates of the parts of the Act
involved. However reasonable such a construction might ap-
pear to be as a matter of policy (and on this we express no
opinion) the short answer to it is that the mandatory words
of Section 2 *require* that the referendum petitions be filed be-
fore the first day of June "next after the session at which [the
Act in question] may be passed." As we pointed out recently

in *Ferguson v. Secretary of State,* 249 Md. 510, 517, 240 A. 2d 232, 236 (1968), this Court cannot by construction eliminate (or modify) a mandatory provision in Article XVI and that if a change in that amendment is thought wise or desirable "the remedy is by an appropriate amendment to Article XVI."

### (2)

We now turn to the second question argued by the appellants, i.e., that Judge Evans erred in sustaining the demurrer to the petition when Judge Pitcher had previously overruled the demurrer. From the portions of the Record already set forth above, it is clear to us that Judge Pitcher did not intend to make a final ruling on the demurrer, as the trial court pointed out in its opinion. As the matter was submitted to Judge Evans after Judge Pitcher's death, Judge Evans acted properly in considering the case on the demurrer and he properly concluded that, on the allegations of the petition, no relief could be granted the petitioners as a matter of law. Accordingly, he sustained the demurrer without leave to amend. The alternative procedure of permitting the Secretary of State to file a motion for summary judgment as suggested by his counsel, would have reached the same result since there was no dispute as to any material fact. Consequently, the Secretary of State would have been entitled to judgment as a matter of law. See Maryland Rule 610. In our opinion Judge Evans was justified in giving a final ruling on the demurrer, but, in any event, the result would have been the same on the suggested alternative procedure. There was, therefore, no prejudice to the appellants from the disposition of the case by the ruling on the demurrer.

### (3)

In their brief, the appellants print two editorials, one entitled "A Friendly Judge" appearing in the Baltimore News-American of Friday, June 28, 1968 (the day after the present case had been argued in the lower court), the other, entitled "Still the Slots" appearing in the Baltimore Evening Sun of July 8, 1968, in regard to a case decided in the Circuit Court for Calvert County. The appellants argue that this was prejudicial publicity which denied them due process of law, relying in part upon the decision of the Supreme Court of the United

States in *Sheppard v. Maxwell,* 384 U. S. 333, 86 S. Ct. 1507, 16 L.Ed.2d 600 (1966).

Although the editorial of June 28, 1968, is provocative and contains at least one inaccurate statement, i.e., that Judge Pitcher had ordered a stay of the phase-out law (which he did not), nevertheless there is no showing whatever that this editorial or the one of July 8, 1968, influenced in any way the decision in this case, which, as we have seen, ultimately turned upon the determination of a question of law. No jury trial was involved. The publicity referred to by the appellants is quite different from that involved in *Sheppard* and, as we have indicated, the situation in the two cases was much different.

In any event, the appellants did not raise the issue that the prejudicial publicity denied them due process of law in the lower court and the editorials do not appear in the Record. Nor did the appellants avail themselves of the right under Code (1965 Replacement Volume) Article 75, § 44 to seek removal of the case to another court after the editorials had been published. This issue is, therefore, not properly before this Court for appellate review. Maryland Rule 885.