**STATE of Missouri, Respondent,**

v.

**Dolores C. MILLER, Appellant.**

No. 46947.

Missouri Court of Appeals,
Eastern District,
Division Eight.

Nov. 13, 1984.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Dec. 18, 1984.

Robert B. Ramsey, St. Louis, for appellant.

John Ashcroft, Atty. Gen., Jefferson City, for respondent.

WILLIAM E. TURNAGE, Special Judge.

Dolores C. Miller was found guilty by a jury of capital murder in the death of her husband Errol. On the state's failure to request the death sentence, Dolores was sentenced to life imprisonment with no chance of probation or parole for fifty years.

Dolores contends the evidence was insufficient to support the verdict, she was denied a fair trial because of extensive publicity before and during her trial, she was denied a fair trial because the trial was conducted in a carnival atmosphere, the state failed to disclose certain evidence, and expert testimony was admitted which relied on a test, the results of which were ruled inadmissible. Affirmed.

Dolores was working for a dating service in Memphis, Tennessee, when she noticed a letter from Errol enclosing an advertisement by which he was seeking to meet a lady through the service. Dolores asked her supervisor if it would be all right for her to correspond with Errol instead of running his ad in the dating service publication. Upon receiving a favorable response, Dolores began corresponding with

Errol in the fall of 1981. They first met in November of 1981, in Arkansas, at a point midway between Memphis and Errol's home in Dixon, Missouri.

On January 15, 1982, Dolores went to Dixon and on January 21, she and Errol were married. On January 28, Errol deleted his children's names from his bank account and replaced them with Dolores' name. The account was a $20,000 savings certificate.

Dolores was a licensed practical nurse and knew prior to the marriage that Errol had been having health problems. Although the record does not reveal Errol's age, Dolores was about fifty-two when the two were married.

On February 3, 1982, Errol was admitted to Truman Veterans Administration Hospital in Columbia. He had a history of blackouts and seizures and after a series of tests was performed, it was determined that he had a brain tumor. Errol remained in the hospital until he underwent surgery on February 26 for the removal of the tumor. Further tests revealed that the tumor was malignant.

Dr. Walter Levy, a neurosurgeon, performed Errol's surgery. Shortly after surgery, he advised Dolores that Errol should improve and have some useful life. He testified that immediately after he had advised Dolores of Errol's condition, she stated that she wanted to donate his body to medicine. Dr. Levy said this was a most unusual response from a family member.

Errol was placed in intensive care after the surgery. He improved to the point that he was removed from that unit on March 4 and taken to a private room. About 2:45 p.m. that day, Dr. Levy visited Errol and found him somewhat lethargic but not out of the range of normal variations. Dr. Levy was concerned, however, and ordered some tests. About 5:00 p.m. that same day, Errol was found to be in a deep coma. Dr. Levy felt that something catastrophic must have happened and immediately ordered more tests. A "CAT–SCAN" (brain x-ray) was done but it revealed nothing abnormal in connection with the surgery site. Blood tests showed that Errol's blood sugar had dropped to thirty-two, an abnormally low level. The normal blood sugar range is between sixty and one hundred twenty. Dr. Levy was puzzled by Errol's abnormal blood sugar level because the medications Errol was on following surgery generally elevate one's blood sugar level. Errol was given a large infusion of sugar in the intravenous solution (IV) which had been in his arm vein since the surgery, but when another blood test was run, his blood sugar was even lower, at twenty-four. He was given another large infusion of sugar, and the standard five percent intravenous glucose solution which he had been receiving was increased to ten percent. An endocrinologist was consulted, and by 8 o'clock the next morning Errol's blood sugar level was finally restored to normal. However, Dr. Levy testified that by 5:00 p.m. on March 4, Errol had suffered brain damage to the point that he had little chance of being more than a vegetable, and by midevening his condition was probably beyond any medical ability to restore brain function.

When Dr. Levy advised Dolores of Errol's condition on March 5, she requested that the life support equipment be removed, but Dr. Levy refused her request. Dolores subsequently repeated her request several times and stated that she was a nurse and knew that the practice was not unusual. On March 6 Dolores again discussed Errol's condition with Dr. Levy and stated that she had seen people in his condition and she bet that he would be dead by ten o'clock that night. Dr. Levy replied that it was possible for Errol to live for months. However, Errol died on March 10.

Three physicians who had treated Errol, including Dr. Levy, testified that it was their opinion that Errol died as a result of the abnormally low blood sugar level that occurred on March 4, and that this abnormal condition could have resulted only from a large dose of insulin. The physicians testified that the brain can only use sugar or glucose for energy and it is capable of storing only about a ten or fifteen

minute supply of glucose. When the brain is deprived of an adequate glucose supply, it ceases to function properly. If that condition persists, brain cells begin to die and swelling occurs. If that continues long enough the person will enter into a coma and death can result. All three physicians gave the opinion that Errol died because of the low blood sugar level, which in turn caused the brain cells to cease functioning and ultimately resulted in the coma and his death. The physician who performed the autopsy on Errol testified that the cause of death was an insulin overdose and that he listed that on Errol's death certificate.

After Errol died, Dolores wanted to have his body removed from the hospital immediately. Dolores became angry when told an autopsy was necessary, but the autopsy was performed. There was also evidence that Dolores had experience in administering insulin in her work as a practical nurse, and she knew that if a person received too much insulin, a coma could result.

After Errol's death Dolores was arrested and subsequently gave a statement which the state introduced. In it she stated that she had found a syringe at the nurses' station and had found a vial of insulin in a refrigerator. On March 4 she injected about one hundred units of insulin into Errol's IV. Shortly thereafter, Errol became comatose.

A hospital employee testified that Dolores told her on March 1 that Errol would be dead by March 4, although at that time his progress was satisfactory. A woman whose husband was also in the hospital had become acquainted with Dolores. She testified that on March 4, between 2:00 and 3:00 p.m., she went to Errol's room and saw Dolores standing next to the bed. When Dolores saw her, she jumped to the front of the bed and put something in her purse. Dolores then raised Errol's arm in the air and said, "Looky here, he's had another stroke" and dropped his arm to the bed. Dolores also told the lady that "If the old son-of-bitch lives he's going to a nursing home, I'm not going to fool with him."

Dolores further said that she didn't care whether Errol lived or not.

The landlady at the house where Dolores was staying in Columbia testified that Dolores told her that she had managed to get all of Errol's money into her name.

Dolores testified in her own behalf and admitted making the statement to the police consisting of four and one-half pages. She said three of the pages were true, but that the fourth page, which contained her admission of obtaining the syringe and insulin and injecting it into Errol's IV, was made up by the police officers. She denied injecting Errol with insulin. Dolores also presented highly qualified physicians who testified that they could not say that the cause of death was an insulin overdose.

■■■ Dolores contends that the evidence was insufficient to support the verdict. In determining the sufficiency of the evidence to support the verdict, this court accepts as true all evidence and all reasonable inferences in support of the verdict and disregards that part of the evidence contrary to the verdict. *State v. Turner*, 623 S.W.2d 4, 6[1, 2] (Mo. banc 1981). Viewing the evidence just recited in that light, it is apparent that there was sufficient evidence from which the jury could have believed that Dolores injected one hundred units of insulin into Errol's IV, which then carried the insulin directly into his blood stream and caused an extremely low blood sugar level. This in turn induced a coma by depriving the brain of its necessary supply of sugar or glucose and death resulted.

■■ Dolores contends that she was denied a fair trial because of prolonged and extensive broadcast and print media publicity both before and during her trial. The case was filed in Columbia but was removed to Franklin County on a change of venue. The *St. Louis Post Dispatch* ran an article about the case on the Sunday prior to the Monday commencement of trial. The venire was extensively examined about this newspaper article and any other publicity, and every venireman who was

challenged for cause was excused by the court. The present attack is a very general attack as to the extent of the publicity and Dolores does not assert that any particular venireman seated as a juror had been affected by any publicity. The question of publicity was thoroughly examined by both parties and the court, and there is no indication whatsoever that any juror had formed any ideas about this case or that publicity affected any juror in any way.

■ Dolores next contends that the physical design of the courthouse and the general carnival atmosphere made it impossible for her to receive a fair trial. She relies upon *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), however, there is no similarity whatsoever between this case and *Sheppard*. In contrast to *Sheppard*, where the trial judge turned over the courthouse and courtroom to the press and media, the trial judge in this case maintained strict control over the courtroom. Also in contrast with *Sheppard*, the jury in this case was sequestered from the time it was selected. During recesses a portion of the third floor hallway adjacent to the courtroom was roped off for the jury's exclusive use. There is not a hint in this record that anyone talked with the jury or that the jury was subjected in any way to outside influences. Dolores contends she was confronted by reporters and photographers each time she entered and left the courthouse, but there is no indication that the jury saw this. On the contrary, the record indicated that the court, before excusing the jury each day, had the jury leave the courtroom in the company of bailiffs, and only after the jury had departed were the other persons in the courtroom allowed to leave. Further, the court exercised firm control over spectators and allowed them to enter and leave the courtroom only during breaks in the testimony.

The record is replete with measures taken by the trial judge to insure that the trial was not interrupted by spectators and to insure that the jury was kept apart from everyone else. There is nothing in the entire record of about 1100 pages that indicates any improper conduct on the part of the jury or anyone else.

■ Dolores contends that the state failed to reveal certain medical records in response to Dolores' motion for discovery. Nothing in the legal file indicates that Dolores filed a discovery request. This failure alone would be sufficient to deny the point. *State v. Clark*, 592 S.W.2d 709, 718[9] (Mo. banc 1979). Beyond that, Dolores raised no objection during the trial that any medical records had been withheld, and none of her medical witnesses voiced concern about any missing records.

■ Dolores also contends that the Sunday newspaper article contained favorable character evidence that the state had not disclosed to her. She argues that this good character evidence qualifies as new evidence entitling her to a new trial. Counsel did not introduce any character evidence concerning Dolores, probably because she admitted in her testimony that she had been convicted in 1963 on five counts of writing bad checks. Furthermore, all of the evidence that Dolores contends was newly discovered concerns her own activities which were surely known to her. This evidence thus could not possibly meet the first requirement of newly discovered evidence—that the evidence must have come to her knowledge since the trial. *State v. Riley*, 536 S.W.2d 501, 505[12–14] (Mo.App.1976). Surely Dolores knew of her past activities, and her decision to forgo character evidence cannot in any way be attributed to the state's failure to inform her of her own past activities.

■ Dolores contends that the physicians who testified on the state's behalf based their opinion on the result of the C-Peptide test. On objection by Dolores' counsel, the court had excluded the C-Peptide test results. None of the physicians testified that they considered this test in forming their opinion and counsel, by objection, made sure in the case of at least one physician that this was true. In short, nothing in the record indicates that any

witness had relied on the test in forming his opinion.

 Dolores argues that the state failed to prove a motive for the crime. The facts outlined above certainly show a motive, but even assuming they do not, motive is not an element of a crime and proof of it is not essential to sustain a conviction. *State v. Taylor*, 356 Mo. 1216, 205 S.W.2d 734, 737[6, 7] (1947).

The record reveals that Dolores had a fair trial with sufficient evidence to support the jury's verdict. The judgment is affirmed.

PUDLOWSKI, P.J., and MELVYN WIESMAN, Special Judge, concur.