

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 36746-1-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| EUGENE ALEC JUPP, | ) | |
| | ) | |
| Appellant. | ) | |

FEARING, J. — Eugene Jupp challenges the sufficiency of evidence for his conviction for second degree murder. Because we find more than sufficient evidence of guilt, we affirm.

## FACTS

On April 5, 2018, employees of the City of Spokane Waste to Energy Facility Recycling & Disposal Site recycle unit discovered the deceased body of Stephanie Standen on the recycle conveyor belt. A medical examiner later determined that Standen

died during the night of April 3 or the morning of April 4, 2018. The State accused and the trial court, after a jury trial, convicted Eugene Jupp of Standen's murder. Jupp shared, with Standen, a rental dwelling owned by Georgia and Stanley Miller. Unfortunate and unusual circumstances led to the homicide.

Because accused Eugene Jupp only challenges the sufficiency of evidence to convict him of second degree murder, our recitation of the facts far exceeds our application of the law to the facts. We purloin the facts from trial testimony presented by landlords Georgia and Stanley Miller, neighbor Renee Cebula, Adult Protective Services (APS) investigator Craig Hirt, City of Spokane refuse collector Bradley McPhee, Spokane Police Patrol Officer Shaun Tylock, Spokane Police Department supervisor of detectives in its major crimes unit Sergeant Zachary Storment, Spokane Police Detective Brian Cestnik, Spokane Police Detective Christopher Bode, Spokane County Sheriff's Office crime scene examiner Natalie Ruckenbrod, Spokane County Medical Examiner Sally Aiken, Washington State Patrol forensic scientist Brittany Wright, Washington State Patrol forensic scientist Teresa Jo Kemmerer, Washington State Patrol forensic scientist Trevor Allen, Eugene Jupp's daughter Bailey Mahugh, Eugene Jupp's son Caylan Jupp, Eugene Jupp's wife Leann Hughes, and Eugene Jupp. Legal doctrine compels us to emphasize the evidence favorable to the State, but we also mention some contravening evidence presented by Eugene Jupp.

2

We begin with the relationship between victim Stephanie Standen and Good Samaritans Georgia and Stanley Miller. In 2016, the Millers befriended the deceased, Stephanie Standen, when Standen convalesced at Sacred Heart Medical Center and Standen needed a dog sitter for her poodle. Georgia Miller's cousin worked at Sacred Heart, and the cousin notified Georgia of the need for a dog sitter.

After Georgia Miller began caring for Stephanie Standen's poodle, frail, seventy-eight-year-old Standen was committed to Eastern State Hospital. Standen suffered from schizophrenia and, on good days, a penchant for numerology. The kindly Georgia considered Standen isolated, and so Georgia weekly visited Standen at Eastern State Hospital.

Stephanie Standen responded positively to medication administered at Eastern State Hospital. In February 2017, the mental health hospital planned to release Standen, but Standen lacked housing. Georgia and Stanley Miller agreed for Standen to reside at their home, until suitable housing became available. Standen and her dog lived in the Millers' spare bedroom for several months. Georgia provided Standen transportation to appointments and social events during that time. Standen took her medications regularly, and she trusted Georgia with the care of her poodle.

Throughout Standen's stay at Georgia and Stanley Miller's abode, the Millers attempted to find permanent housing for Standen, but the couple faced obstacles. Standen lost her wallet and identification, which took time to replace. The tight rental

3

housing market created long waitlists for vacancies, and potential landlords denied Standen's application because of her previous landlord/tenant disputes.

On June 10, 2017, Stephanie Standen suffered a stroke. She returned to Georgia and Stanley Millers' home after her release from the hospital. Following the stroke, Standen refused to take her medications and struggled to climb stairs. Standen's mental health deteriorated. She stayed in her room with her dog for long periods, she grew increasingly stubborn, and she chattered about angel numbers. If the sequence of numbers were not "right that day," Standen refused to leave the house. Report of Proceedings (RP) at 355. The Millers still could not locate suitable housing for Standen.

In September 2017, Georgia and Stanley Miller traveled for six weeks in Ireland. They did not wish Stephanie Standen to stay alone in their home during the trip. Before the Millers left Spokane and on Stephanie Standen's learning of the upcoming trip, Standen summoned a taxi, grabbed her suitcase, purse, dog, and puppy pads, and moved into a seedy hotel. Later she transferred to the House of Charity.

Georgia and Stanley Miller spoke with Stephanie Standen, in December 2017, after their return from the Ireland trip. Standen informed the Millers that she no longer felt safe at the House of Charity shelter, and she requested that the Millers convey her to a hotel. After a few days, the motel could no longer accommodate her, so the Millers moved Standen into their vacant rental property on West 15th Avenue on Spokane's South Hill.

4

Stephanie Standen occupied the main floor bedroom, in the 15th Avenue residence, which room adjoined the only bathroom on the main level. Standen's bedroom did not have a lock on the door.

Georgia and Stanley Miller intended that Stephanie Standen occupy the 15th Avenue home for no longer than the end of December 2017, but the Samaritan couple encountered difficulties again in finding other housing for Standen. Eventually, Adult Protective Services tried to find Standen assisted living. Meanwhile, a compassionate Georgia Miller visited Standen daily and brought her food and puppy pads. Standen rarely left her bedroom.

In early December 2017, Eugene Jupp placed a note on the door of the 15th Avenue rental property, which note expressed interest in renting the house for his family. Jupp, his wife Leann Hughes, and their daughter recently relocated from Montana to Spokane and temporarily resided in a hotel. Their young daughter attended Roosevelt Elementary School, which neighbored the Miller rental.

Georgia and Stanley Miller met with Eugene Jupp to discuss the possible rental of the West 15th Avenue residence. Georgia explained to Jupp that a friend resided in the house, but that the Millers hoped the friend garnered other housing by early January. Georgia learned that Jupp painted houses professionally and, because the rental house needed maintenance, the Millers agreed that Jupp and his family could stay in the house

5

rent free in exchange for his labor. Jupp would pay for the utilities. The Millers and Eugene Jupp agreed that, once Stephanie Standen moved, Jupp would pay full rent.

Eugene Jupp suffers from plaque psoriasis. According to Leann Hughes, the skin disease causes Jupp to frequently bleed.

On November 18, 2017, Eugene Jupp and his family moved into the house on 15th Avenue. They occupied the upstairs bedrooms and used the kitchen and living room on the main floor.

During trial, the wife, Leann Hughes, described interactions with Stephanie Standen to the jury. Shortly after moving into the rental, Standen approached Hughes, who was cooking, placed deli chicken on the counter and told Hughes to "'eat it'" and that "'it's been poisoned.'" RP at 903. Minutes later, Standen pointed to Christmas lights outside and said, "'We're all going to hell. God is going to punish us all.'" RP at 904. Standen proceeded to dance a jig.

According to Leann Hughes, Stephanie Standen used the bathroom with the door open, and her six-year-old daughter wandered into the bathroom two or three times. Standen yelled at Hughes' daughter if she approached the bathroom. Standen snapped at Hughes: "'If she were my child, I know what I would do with her.'" RP at 905. Standen had such bad diarrhea that she would leave fecal matter on countertops, the floor, and down the edge of the toilets. Hughes would not let her daughter use the first floor restroom.

6

On January 3, 2018, Leann Hughes returned to Whitefish, Montana with the couple's daughter. Eugene Jupp informed Georgia and Stanley Miller that his wife and daughter relocated because of Stephanie Standen's odd behavior. Jupp and Hughes did not want their daughter exposed to the behavior.

Leann Hughes disagrees with Eugene Jupp as to the reason she returned to Montana. According to Hughes, she went in order to retrieve belongings, and she planned to immediately return to Spokane. She took her daughter with her because she and Eugene Jupp were having trouble finding daycare in Spokane and because of financial difficulties. Due to significant snow fall in Montana, Hughes canceled her plans to return to Spokane and decided to remain in Montana until the end of the school year. She enrolled the daughter in a Whitefish school. Hughes denied that she returned to Montana because of the behavior of Stephanie Standen.

On January 4, 2018, the day after his family departed for big sky country, Eugene Jupp reported Stephanie Standen to Adult Protective Services. Jupp related that Standen ate spoiled food, stayed constantly in her bedroom, went to the bathroom in her bedroom, and suffered from deteriorating mental health.

APS investigator Craig Hirt went to the West 15th Avenue residence on January 18, 2018. Eugene Jupp escorted Hirt into the home and walked Hirt to Stephanie Standen's bedroom door. Standen refused to open the door and insisted that Hirt contact Georgia Miller. Standen slipped a note, with Georgia's phone number thereon, under the

bedroom door. Hirt left the residence. Jupp, outside the dwelling, expressed concerns to Hirt that Standen would burn down the house. Jupp complained that his wife and daughter moved from the house because of Standen and would not return until Standen vacated the home.

Early in the morning on January 23, 2018, Eugene Jupp called the police to report an incident between himself and his "roommate." RP at 518, 942. Spokane Police Department Officers Shaun Tylock and Craig Butler arrived at the West 15th Avenue residence at 1:30 a.m. The officers entered the home and found a tipped-over dining room chair and a radio and flashlight on the floor. Jupp explained that he awoke to Stephanie Standen flinging the objects. Jupp described Standen as a paranoid schizophrenic, who hates men. Jupp added that Standen's bizarre behavior caused his wife and daughter to return to Montana. Jupp asked the two officers if they knew about a book called *Burnt Offerings*.

Officers Shaun Tylock and Craig Butler knocked on Stephanie Standen's bedroom door and spoke with her for a few minutes with the door closed. Once the officers established that Standen resided in the house, they told Jupp they could not assist him. Jupp responded that the owners were in the process of evicting Standen, that APS was involved, and that he was "'just trying to cover [his] ass.'" RP at 521. Jupp complained that he paid the power bill to heat Standen's room, and Standen lived rent-free at the dwelling.

8

In late January 2018, APS investigator Craig Hirt contacted Georgia Miller. Georgia informed Hirt that Stephanie Standen had been earlier committed to Eastern State Hospital. Georgia expressed concern that Standen did not take needed medication.

Craig Hirt and Georgia Miller met at the 15th Avenue dwelling on January 26, 2018. The two sat in the living room for fifteen minutes before Stephanie Standen agreed to meet with Hirt. Hirt entered Standen's bedroom and reviewed Standen's living conditions. The room smelled of feces and garbage, Standen appeared unclean, she wore filthy clothes, and she sat on a mattress on the floor. Hirt spoke with Standen for one hour, despite Standen's suspicion of him. Standen refused APS assistance. Before leaving, Hirt left a consent form with Standen in the event she changed her mind. In the coming weeks, Georgia Miller unsuccessfully attempted to procure housing for Stephanie Standen at Catholic Charities and Home Community Services.

APS investigator Craig Hirt next visited Stephanie Standen on February 16, 2018. Hirt met with Standen in her bedroom. The room smelled of excrement and refuse. Standen wore dirty clothes. Standen again refused to sign paperwork to gain APS assistance.

Craig Hirt later saw Stephanie Standen on March 2, 2018. An unbathed Standen complained of being captive in her home. Hirt suggested she take the dog for a walk, but Standen refused to leave her room. Hirt went to the West 15th Avenue abode again on March 23, but Standen refused to open her bedroom door.

9

Each time Craig Hirt visited the 15th Avenue abode, either Georgia Miller or Eugene Jupp allowed Hirt entrance into the residence. Stephanie Standen never signed a consent form to gain APS services. According to Eugene Jupp, Stephanie Standen left the residence only twice, while Jupp resided at the dwelling. Each time, Standen left with Georgia Miller.

In late March 2018, Leann Hughes and her daughter traveled to Spokane to visit Eugene Jupp for a few days because of the daughter's spring break from school. According to Hughes, she then spoke with Jupp about the need for Jupp to find a roommate until her and her daughter returned to Spokane. Hughes averred that the roommate would have stayed in the upstairs bedroom or in the basement of the rental. She directed Jupp to locate a female roommate because men do not clean the house or timely pay rent.

Eugene Jupp's adult son, Caylan Jupp, resided in Spokane and visited his father nearly every day at the West 15th Avenue residence. Caylan only saw Stephanie Standen three or four times during the months that Jupp lived at the dwelling. Caylan and his father often worked in the yard, including pruning grape vines and other brush. The two performed yard work, on March 31, 2018, when Jupp's face and arms incurred numerous scratches. According to Leann Hughes, she noticed that Jupp cut his face while performing yardwork. After completion of the yard work, Jupp packed sixteen 55-gallon bags with leaves, rocks and wood.

10

Leann Hughes returned to Montana on April 1. Jupp turned glum because of the absence of his wife, and he committed himself to his work.

Stephanie Standen's living conditions progressively worsened. By April 2018, Standen stored soiled food in her bedroom closet. She used the puppy pads, instead of the home's human restroom, for her waste needs. She never left her bedroom.

The last reported interaction of any person with Stephanie Standen occurred on Tuesday, April 3, 2018. Georgia Miller visited Seattle that week. Stanley Miller and Aaron Anderberg, a social worker with Pathways of Washington, visited Standen at the rental home on 15th Avenue. Eugene Jupp was present. Miller and Anderberg spoke with Standen for two hours, while attempting to convince her to sign paperwork so that Anderberg could procure her housing. Standen refused to sign, but suggested she might sign at the end of the week. In Jupp's presence, Stanley Miller shared his concerns with Anderberg that Standen would not sign the paperwork on Friday and that, if Anderberg appeared on Friday, she would tell Anderberg to return on Monday.

As Aaron Anderberg walked to his car on April 3, Eugene Jupp approached him and asked if Anderberg would be able to assist Stephanie Standen. Anderberg explained that he could not provide any services because Standen refused to sign the necessary paperwork. An upset Jupp responded that his family moved from the home because of Standen's presence. Jupp told Anderberg to "'have a nice day asshole'" and remarked that providers like Anderberg talk a good story, but do not help.

11

Bailey Mahugh, Eugene Jupp's adult daughter, also dwelled in Spokane and visited Jupp at the home on West 15th Avenue two to three times a week. Mahugh never met or saw Stephanie Standen. Mahugh, with her son, visited Jupp at the residence on April 3, 2018, between 4:30 p.m. and 6:30 p.m. At 6:30, she, her father, and her son left the home to run errands for an hour and a half. During the time together on April 3, Jupp was his happy normal self.

Eugene Jupp's son, Caylan, visited his father at the Miller rental property on April 3, 2018 between 9:00 p.m. and 10:30 p.m. Caylan found his father's demeanor normal. Caylan did not see Standen.

Bailey Mahugh returned to her father's residence in the early afternoon on April 4, 2018. Her father appeared normal.

The City of Spokane collected garbage and recycling on Thursdays in the West 15th Avenue rental property neighborhood. On Wednesday evening, April 4, Eugene Jupp walked his recycling receptacle to the curb between 6:30 and 7 p.m.

Caylan Jupp returned to his father's rental on April 4 between 8:30 and 9:00 p.m. The two smoked a cigarette on the front porch, and Caylan noticed nothing unusual about Jupp's demeanor. They spoke for approximately two hours before Caylan returned home.

According to Eugene Jupp, he activated the residence's alarm system at night on April 3 and 4, and, during those nights, the alarm did not sound. He did not see anyone

12

come or go from Stephanie Standen's room except Stanley Miller and Aaron Anderberg on April 3.

At 7 a.m., on Thursday, April 5, 2018, Renee Cebula, Eugene Jupp's neighbor across the street, hurriedly placed her garbage and recycling cans on the street, when she spied Jupp sitting on his porch puffing a cigarette. Between 7:30 and 7:45 a.m. on April 5, Bradley McPhee, an employee of the City of Spokane, collected material from the recycling bin in front of Georgia and Stanley Miller's rental property. McPhee noticed, on the truck's camera, that nonrecyclable material, including black plastic bags, fell from the residence's bin and into his truck. One bag looked fuller than the other. McPhee could have issued a violation for the offense of placing nonrecyclable material in the bin, but withheld the notice of violation because this was the property's first offense. He determined to remember the violation in the event the home's occupant repeated the misconduct. As the contents of the bin poured into his truck, McPhee heard a loud and heavy thud. McPhee deposited his truck's collected recycling refuse at the recycling center at 1:26 p.m. that afternoon.

On April 5 at 10 a.m., Stanley Miller returned to the house on West 15th Avenue to facilitate a phone call between Stephanie Standen and Aaron Anderberg. Anderberg wished to receive verbal consent over the phone from Standen so that he could start looking for housing. Eugene Jupp sat in the living room. Miller knocked on Standen's bedroom door several times and received no response. Miller entered Standen's

13

bedroom, and, not seeing Standen, peered under the blankets on her bed. Miller did not locate Standen, but her dog, suitcase, purse, and other belongings remained inside the room. A tan blanket that had been on her bed was missing.

Stanley Miller searched the bathroom and basement for Stephanie Standen. Eugene Jupp explained to Miller that he had not seen Standen, and Jupp helped search for her on the second floor of the house. Miller scoured the neighborhood and the grounds of nearby Roosevelt Elementary. Stanley Miller contacted Aaron Anderberg, who contacted the jail and local shelters and then filed a missing person's report with police.

On April 5, 2018 at 4:15 p.m., Thomas Young, the operations manager at the City of Spokane's recycling center, stopped operations when employees found a human body on the presort line. Young checked the body for vital signs and detected none. The body was unclothed from the waist down except for socks. The upper body wore three layers of clothing. Four pieces of discarded mail from 15th, 17th, and 21st West Avenue lay near the dead body. Young called the police. Police transported the body for an autopsy.

On April 6, 2018, Dr. Sally Aiken, a medical examiner for Spokane County, performed an autopsy on Stephanie Standen's body. Dr. Aiken removed dirt, glass, garbage, and post cards affixed to Standen's body during the autopsy. Aiken took DNA samples from Standen's face and hands.

Based on the autopsy, Dr. Sally Aiken concluded that Stephanie Standen sustained many premortem, perimortem, and postmortem injuries. Perimortem injuries are injuries

14

that the examiner cannot determine if the victim suffered them before or after death. Dr. Aiken deduced that many of Standen's injuries occurred postmortem as a result of being placed in the recycle bin, dumped into the garbage truck, and deposited onto the conveyor belt at the recycling center.

According to Dr. Sally Aiken, Stephanie Standen, before her death, suffered a bruise on her left leg, a contusion on her left shin, a bruise on her left foot, a defensive injury to her left wrist, bruises to her left arm, possible defensive wounds to her fingers, a contusion to her chest and armpit area possibly from being struck or grabbed, contusions to her nose, eyes, forehead, and cheeks, laceration on her left eyebrow caused by blunt force trauma, a fractured nose, a fracture of the orbital bone above the right eye, a fractured jaw, and a fractured neck. Standen sustained the bruising on her cheek both externally and on the inside of her mouth. Standen sustained a fractured left arm and fractured skull after her death. Standen also suffered rib fractures, but Dr. Aiken could not determine whether Standen sustained the rib fractures before or after death.

Dr. Sally Aiken concluded that Stephanie Standen's death resulted from blunt force injuries to her head that caused facial and skull fractures. Dr. Aiken described the manner of death as a homicide. Due to Standen's age and her small and frail frame, Standen had a heightened risk to die from the injuries. Based on Standen's rigidity and lividity at the time of the autopsy, Aiken estimated Standen likely died late on April 3 or early on April 4, 2018.

15

On April 6, 2018, law enforcement returned to the City of Spokane recycling plant to identify when the deceased body arrived at the recycling plant. After speaking with plant employees, law enforcement narrowed the number of trucks that could have transported the body to the facility. Officers checked missing person reports and found the name of Stephanie Standen.

Later on Friday April 6, Spokane Police Department Sergeants Zachary Storment and Glenn Bartlett traveled to Georgia and Stanley Miller's rental residence on West 15th Avenue. Officers observed Eugene Jupp on the front porch when they arrived. Jupp slumped his shoulders, his hands shook, and he appeared hungover. The officers notified Jupp that they were investigating a missing person, who resided at the address. Jupp commented that a mentally ill person lived at the residence, but that he had not seen her for a month. Jupp later declared that he had not seen the lady for three weeks. When asked if she might be in the home, Jupp replied that the occupant never left the house without her dog and the dog remained inside. Jupp added: "'Well, she could still be in her room maybe. I just haven't seen her.'" RP at 559.

Eugene Jupp permitted Officers Zachary Storment and Glenn Bartlett to enter the residence. The duo went to Stephanie Standen's bedroom and found the room in disarray. Standen's poodle cowered in the corner. Officers remained at the residence for hours and conducted an investigation. The officers saw no sign of a forced entry into the

16

home. As he had done previously, Jupp referenced a book called *Burnt Offerings* to law enforcement.

On April 6, Spokane Police Department Detective Christopher Bode joined his fellow officers at the dwelling and conversed with Eugene Jupp. Jupp explained to Bode that his wife and daughter moved from the home in January. Detective Bode accompanied Jupp to the basement where Bode found a calendar marking days when Standen behaved poorly. The calendar recorded Standen's "speaking in tongues" and "hollering and banging on the walls." RP at 661.

Detective Christopher Bode asked Eugene Jupp to come to the detective's station to give a formal statement. Jupp rode to the station with one of the sergeants as Jupp did not have a vehicle. During the interview, Jupp invoked his right to counsel, and officers ceased all questioning.

On April 6, 2018, Spokane Police Department detectives obtained warrants to search the house on West 15th Avenue, Jupp's person, and his cellphone. During the search, officers found bloodstains on the floor of the living room and a bloodstained shirt. The Washington State Patrol Crime Lab forensic testing later revealed that the blood in the living room and on the shirt matched Eugene Jupp's DNA profile.

During the search on April 6, law enforcement located the recycle bin and garbage can near the rear of the abode. Officers found a ceiling tile, empty vinegar bottles, and beer cans in the garbage can. The recycle bin was empty except for water in the base of

17

the bin. The forensic laboratory later identified the presence of Stephanie Standen's blood at the bottom of the recycle bin. The blood sample found in the recycling bin was degraded, however, due to heat, bacteria, or rain water.

On April 6, Detective Christopher Bode perused Eugene Jupp's cell phone. Bode noticed that Jupp's phone received text messages in response to a Craigslist ad for a room to rent. Detective Bode reviewed the Craigslist site on his computer and found an ad posted on April 4, 2018 at 12:59 p.m. The ad identified the address of the Miller property on 15th Avenue West, Spokane. The posting stated, "'Have rooms available. Professionals or students. No drama. Safe house. Looking for someone who can appreciate and respect each other. Ladies only. Sorry fellas.'" RP at 702. The ad listed the room as "private" with a "private bath" and stated the room was "'available now.'" RP at 702. The contact name on the ad was "Gene." RP at 702. Jupp did not ask Georgia Miller for her permission to post the advertisement, nor would she have allowed him to do so.

On April 6, detectives collected Eugene Jupp's clothing, swabs from some injuries, and swabs of his cheek. Officers photographed Jupp's injuries. Jupp sustained marks on his face and scratches on his hands and arms. Officers could not procure fingernail clippings from Jupp because of the shortness of the nails.

On April 6, after law enforcement officers searched the West 15th Avenue residence, Caylan Jupp helped his father pack some of the father's belongings because

18

Jupp had safety concerns with the home and the father wished to live elsewhere temporarily. Eugene Jupp had no plan to move permanently. Caylan collected the security system and cable and internet system. He later returned internet and cable equipment to Comcast because of high fees paid by his father. Caylan kept the residence's security system because he believed the system would exonerate Jupp from any accusations of murdering Stephanie Standen.

On April 12, 2018, Georgia and Stanley Miller returned to the rental house on 15th Avenue and found the back door ajar. Eugene Jupp and all his possessions were gone. The Millers changed the locks to the house on April 13.

Brittany Wright, a forensic scientist with the Washington State Patrol, specializes in analysis of DNA evidence. Wright analyzed swabs collected from four different areas within the bottom of the recycle bin collected from the Miller rental property on 15th Avenue. Two of the swabs tested positive for blood and matched Stephanie Standen's DNA profile. Wright explained that the estimated probability of selecting an unrelated individual at random from the United States population with a matching profile is 1 in 22 septillion.

Brittany Wright tested blood stains on Eugene Jupp's t-shirt and found a single source DNA profile attributed to Jupp. Wright excluded Standen from a mixed DNA profile on Jupp's shirt. Wright examined swabs obtained from the blood stains on the

living room floor, and she determined that the single source DNA profile matched Jupp. Standen's blood was not recovered from inside the home.

Brittany Wright analyzed left and right hand fingernail clippings from Stephanie Standen. From the right hand fingernails, she found staining consistent with blood and a low level of male DNA. The amount of male DNA was insufficient to determine, by testing, whether its source was Eugene Jupp. Forensic testing of gauze from Standen's face revealed the presence of male DNA in an amount too small to test.

Brittany Wright performed testing on gauze collected from Stephanie Standen's right eye. The testing found Stephanie Standen's blood and DNA from two male individuals. Nevertheless, Wright excluded Eugene Jupp as being a contributor to the mixture.

Brittany Wright tested the collar of Stephanie Standen's sweatshirt, fleece shirt, and t-shirt from which Jupp could not be included or excluded as a possible contributor to Y-STR DNA. Wright explained that the placement of Standen's body in the recycling bin increased the opportunity for outside DNA contamination of her body since the body came in contact with various items of waste and recyclable material.

As part of his investigation into Stephanie Standen's death, Detective Christopher Bode read the book *Burnt Offerings*. At trial, Bode summarized the book to the jury:

> So the book is Burnt Offerings by Robert Marasco. It was published in 1973. There's eleven chapters total and it follows a family who started—a husband and wife and an eight-year-old son, I believe, who live

20

in the inner city. They want to get away for the summer. They find an ad for a largest estate out in the country that's perfect for a large family. They go out. They rent super cheap. They agree to live in the house for two months, very cheap rent. The kind of caveat is that the mother of the brother and sister who live in the house stays upstairs in the bedroom and that the book says that she shouldn't be a bother; just put some food outside of her door at certain times and she will be fine, but don't try to contact her.

They basically become—odd things start happening. It ends up being a horror film or kind of a horror genre book. In the end, the wife is possessed by the house. The husband and the son both die and another female and then the mother of the house ends up being—the one that was upstairs in the bedroom ends up being kind the soul of the house and keeps the house alive, I guess, if you will.

RP at 703-04.

## PROCEDURE

The State of Washington charged Eugene Jupp with one count of murder in the second degree. The State alleged that Jupp, while committing the crime of second degree assault, caused the death of Stephanie Standen. The State also asserted the sentencing aggravator of Stephanie Standen being a particularly vulnerable victim or incapable of resistance.

Eugene Jupp moved the trial court for dismissal of the charges after the State rested its case. He contended that the State presented insufficient evidence for a jury to find him guilty. Jupp emphasized that the State presented no evidence that Jupp assaulted Stephanie Standen, an element of the second degree murder charge. The trial court denied the motion to dismiss.

21

After denial of the motion to dismiss, Eugene Jupp presented evidence. He denied assaulting or killing Stephanie Standen.

Following the State's rebuttal evidence, Eugene Jupp again moved for dismissal of the charge due to insufficient evidence. The trial court denied the motion for a second time.

The jury found Eugene Jupp guilty of murder in the second degree. The jury entered a special verdict of aggravating circumstances that Stephanie Standen was a particularly vulnerable victim or incapable of resistance.

LAW AND ANALYSIS

Eugene Jupp assigns error to the trial court's refusal twice to deny his motion to dismiss and the court's submittal of the prosecution to the jury for decision. Under legal canon, we do not address his assignment based on the motion being presented after the State rested, since Jupp presented his own evidence thereafter. We deem the assignments of error to be governed by the same rules applied when the accused challenges the evidence for the first time on appeal.

A criminal defendant may challenge the sufficiency of the evidence (a) before trial, (b) at the end of the State's case in chief, (c) at the end of all the evidence, (d) after the verdict, and (e) on appeal. *State v. Jackson*, 82 Wn. App. 594, 607-08, 918 P.2d 945, (1996). If the defendant proceeds to present evidence in his own behalf after denial of his motion for dismissal, he may not claim on appeal that the denial of his mid-trial motion

22

to dismiss was error. *State v. Allan*, 88 Wn.2d 394, 396, 562 P.2d 632 (1977). At the end of all the evidence, after verdict, or on appeal, a court examines sufficiency based on all evidence admitted at trial, including the defense's evidence. *State v. Jackson*, 82 Wn. App. at 608.

The jury found Eugene Jupp guilty of second degree murder. RCW 9A.32.050 defines second degree murder and declares, in part:

> (1) A person is guilty of murder in the second degree when:
> (a) With intent to cause the death of another person but without premeditation, he or she causes the death of such person or of a third person; or
> (b) He or she commits or attempts to commit any felony, including assault . . . , and, in the course of and in furtherance of such crime or in immediate flight therefrom, he or she . . . causes the death of a person.

The State relied only on subsection (1)(b) when prosecuting Eugene Jupp. The State did not charge Jupp with intent to kill Stephanie Standen, only with the death of Standen during an assault on her. Thus, we must decide whether the State presented sufficient evidence to prove Jupp assaulted Stephanie Standen and the assault caused her death.

We list familiar principles of law we apply to challenges of sufficiency of the evidence. In assessing the sufficiency of the evidence, this court views the evidence in the light most favorable to the State and decides whether any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). A claim of insufficiency admits the truth of the State's evidence. *State v. Drum*, 168 Wn.2d 23, 35, 225 P.3d 237 (2010). We draw all

23

reasonable inferences from the evidence in favor of the State and interpret the evidence most strongly against the defendant. *State v. Salinas*, 119 Wn.2d at 201. We deem circumstantial and direct evidence equally reliable. *State v. Thomas*, 150 Wn.2d 821, 874, 83 P.3d 970 (2004). Nevertheless, inferences based on circumstantial evidence must be reasonable and cannot be based on speculation. *State v. Vasquez*, 178 Wn.2d 1, 16, 309 P.3d 318 (2013). The trier of fact, not the reviewing court, resolves credibility determinations. *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).

Eugene Jupp concedes that the evidence, viewed in a light most favorable to the prosecution, establishes that Stephanie Standen died from blunt force trauma. Accordingly, Jupp admits the evidence was sufficient to establish a homicide. Nonetheless, Jupp claims insufficient evidence exists to prove that *he* committed the homicide. He emphasizes the lack of direct evidence of his assaulting Standen. We disagree that insufficient evidence supports an assault. By examining the sufficiency based on all the evidence admitted at trial and drawing all reasonable inferences in favor of the State, we must conclude that sufficient evidence supports that Jupp assaulted and killed Standen.

Viewing the evidence in a light most favorable to the State, a reasonable juror could conclude that Eugene Jupp had access and opportunity to assault and kill Stephanie Standen. Jupp and Standen were the only two individuals who dwelled in the Miller rental home. The evidence established that the elderly and frail Standen suffered from

mental illness and rarely left her bedroom. No evidence showed that Standen left the residence in the weeks, if not months, preceding her death. When Standen left the residence, she took her purse, suitcase, and dog, and Georgia Miller typically accompanied her. Miller visited Seattle the week Standen went missing.

On April 3, 2018, when Aaron Anderberg and Stanley Miller visited the rental home, Stephanie Standen remained in her room. According to the medical examiner, Standen likely died some time that evening or the next morning, April 4. Jupp's own testimony placed himself in the residence alone with Standen during these critical hours. Jupp admitted at trial that the residence's alarm did not sound during April 3 or 4. Detectives found no signs of forced entry.

Evidence supported a conclusion that Eugene Jupp possessed motive to kill Stephanie Standen. Jupp and his family moved into the rental home with an obligation to pay no rent, but with the complication that Standen also resided in the dwelling. Standen's room constantly was filthy and smelled of feces. She yelled and banged on walls. She refused to sign paperwork from social workers who attempted to find her adequate housing.

On January 3, 2018, Eugene Jupp's wife and daughter moved from the home and returned to Montana. Although Jupp's wife, Leann Hughes, averred that Stephanie Standen did not precipitate the move, Hughes also testified that Standen repeatedly yelled at her daughter, asked Hughes to eat poisoned food, soiled the main floor bathroom, and

told Hughes she was going to hell.  Jupp repeatedly told police and social workers that his family left because of Standen.  On January 4, 2018, Jupp called APS and complained that Standen suffered from mental illness and self-neglect.  On January 23, 2018, Jupp called 911 because of Standen's behavior.  Jupp mentioned the book called *Burnt Offerings* to police during this interaction.

At the conclusion of Aaron Anderberg's meeting on April 3, 2018, Eugene Jupp cursed at Anderberg, while accusing him of inaction.  Eugene Jupp placed an ad on Craigslist looking for a roommate, without the Millers' permission, on April 4, 2018, at 12:59 p.m.  He offered a room with a private bathroom, while the only such room in the residence was Stephanie Standen's bedroom on the main floor level as the upstairs bathroom served multiple bedrooms.

Stephanie Standen's autopsy revealed a fractured nose and defensive wounds on her wrists and fingers.  Forensic testing revealed trace amounts of Standen's blood in the bottom of Eugene Jupp's recycling bin.  The refuse collector found the bin's load to be heavier than usual and made a loud sound when it hit the base of the garbage truck.  Jupp admitted that he placed the trash and recycling bin on the side of the street.  Jupp lacked a vehicle and relied on public transportation.  A reasonable juror could infer that, because Jupp had no car, he lacked an alternative to disposing of Standen's body other than to dump her in the recycling bin.

26

STATEMENT OF ADDITIONAL GROUNDS

Eugene Jupp raises two issues in a statement of additional grounds. First, Jupp contends that the trial court violated his Sixth Amendment to the United States Constitution right to a fair trial when empaneling a biased jury. Jupp argues that the State picked a favorable jury as a result of rushing the screening of potential jurors during voir dire. Jupp claims that some potential jurors removed for cause likely influenced jurors 8 and 11 when expressing the formers' opinions of Jupp's guilt after seeing media coverage of the crime. Nevertheless, juror 11 told the court that she could be impartial when asked by the trial court. Jupp also fails to show how juror numbers 8 and 11 were negatively influenced by those jurors removed for cause. Therefore, we reject this statement of grounds.

Eugene Jupp next contends that his right to a fair trial was violated because prejudicial information was leaked to the media by the prosecution, court staff, and detectives. Jupp argues the trial court should have changed venue to remedy this exposure. Jupp references thirteen articles published by the Spokane news media, some published before Jupp went to trial and some after his conviction. Jupp fails to cite to the record to show that members of the jury read the news stories or that any jury member was negatively influenced by the media. We reject this contention as Jupp fails to show a reasonable likelihood that prejudicial news prior to trial prevented him from receiving a

27

fair trial. *See Sheppard v. Maxwell*, 384 U.S. 333, 363, 86 S. Ct. 1507, 16 L. Ed. 2d 600 (1966).

CONCLUSION

We affirm Eugene Jupp's conviction for second degree murder.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Siddoway, J.

_____
Pennell, C.J.